UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
PAUL JUNG, M.D., et al.,                      )
                                              )
         Plaintiffs,                          )
                                              )
    v.                                        )        Civil Action No. 02-0873 (PLF)
                                              )
ASSOCIATION OF AMERICAN                       )
    MEDICAL COLLEGES, et al.,                 )
                                              )
         Defendants.                          )
_____)

OPINION

      Plaintiffs in this putative class action are medical school graduates currently or

formerly enrolled in resident physician "residency" programs.  The defendants can be categorized

into two groups:  the organizational defendants (organizations and associations that participate in

the administration of graduate medical education in the United States) and the institutional

defendants (universities, medical schools, foundations, hospitals, health systems and medical

centers that sponsor medical residency programs).  The defendants have filed three types of

motions to dismiss: (1) motions to dismiss for lack of personal jurisdiction; (2) motions to

dismiss for lack of subject matter jurisdiction and to compel arbitration; and (3) motions to

dismiss for failure to state a claim upon which relief can be granted.

## I.  BACKGROUND

      Plaintiffs filed suit charging that the defendants have violated Section 1 of the

Sherman Act, 15 U.S.C. § 1.  Plaintiffs allege that the defendants have contracted, combined and

conspired among themselves to "displace competition in the recruitment, hiring, employment and compensation of resident physicians, and to impose a scheme of restraints which have the purpose and effect of fixing, artificially depressing, standardizing and stabilizing resident physician compensation and other terms of employment."  Complaint ("Compl.") ¶ 2.  Plaintiffs assert that there are three intertwining prongs to the antitrust conspiracy.

The first prong of the alleged conspiracy concerns the annual assignment of fourth-year medical students to the institutional defendants' residency programs by the National Resident Matching Program ("NRMP").  The NRMP, an Illinois not-for-profit corporation, is managed and operated by defendant American Association of Medical Colleges ("AAMC") from AAMC's principal office in Washington, D.C.  See Compl. ¶ 15.  The AAMC also is an Illinois not-for-profit corporation, whose membership includes all 125 accredited medical schools, including those medical schools named in the complaint, and approximately 375 major teaching hospitals and health systems, some of which also are named in the complaint.  These hospitals and health systems are member hospitals of a subsection of the AAMC, the Council of Teaching Hospitals and Health Systems ("COTH") Section.  See id. ¶ 17.

Plaintiffs allege that in order to effectuate the assignment, or the "Match," as it is commonly called, prospective medical residents enter into contracts with and submit to the NRMP a ranked list of desired medical resident positions with various institutions ("Student Match Contract").  The institutions themselves also enter into contracts with the NRMP and submit ranked lists of the medical students whom they are interested in hiring ("Institutional Match Contract").  On a date certain, the NRMP through an algorithm "matches" the students' lists against the institutions' rankings, resulting in the assignment of each prospective medical

resident to one residency program.  See Compl. ¶¶ 15, 83-86.  Plaintiffs allege that this system eliminates a free and competitive market and substitutes a centralized, anticompetitive allocation system that assigns prospective resident physicians to a single, specific and mandatory residency program.  Plaintiffs further allege that defendants designed and implemented this system and collectively agree to comply with it in violation of the antitrust laws.  See id. ¶ 83.

Several specific features of this assignment system allegedly serve to impose anticompetitive restraints on medical residency hiring.  Plaintiffs allege that a medical student is required to enter into the Match if he or she wishes to gain employment in a residency program accredited by the Accreditation Council for Graduate Medical Education ("ACGME").  See Compl. ¶ 71.  An individual's participation in an ACGME-accredited residency program in turn is allegedly a prerequisite for specialty certification upon completion of the residency by a member board of defendant American Board of Medical Specialties ("ABMS"), an Illinois not-for-profit corporation consisting of 24 recognized medical specialty certification boards.  See id. ¶¶ 20, 69.  Plaintiffs allege that eventual specialty certification by an ABMS board is considered critical to prospective residents inasmuch as they desire to be "certified" to practice within a specialty following the completion of their residencies.  The practical effect of this structure, plaintiffs charge, is that the vast majority of medical students are compelled to participate in the Match, which is a substitute for all aspects of competitive individual negotiations and requires applicants to commit contractually to any assigned position as a condition of enrolling in the Match Program.  See id. ¶¶ 69, 86.  Furthermore, certain implementing policing mechanisms of the Match allegedly compel compliance with the foregoing restraints.  These alleged mechanisms include the requirement that program participants immediately report suspected policy violations

to the NRMP and advise the relevant organizational authorities of institution or resident

physician violations.  See id. ¶ 86(c).

    In the second prong of the conspiracy, plaintiffs assert that certain aspects of the

aforementioned ACGME accreditation standards, with which the institutional defendants

allegedly voluntarily comply, function to further restrict residency employment.  Specifically,

plaintiffs allege that the ACGME (1) has the authority to regulate the number of employment

positions in a residency program; (2) imposes substantial obstacles to the ability of a resident to

transfer employment from one employer to another during the period of a residency, thereby

effectively making NRMP assignments permanent for the duration of a residency; (3) encourages

and/or requires participation in the Match by an institution as a condition of accreditation; and (4)

directly reviews compensation and other terms of employment with the purposes of fixing and

depressing them.  See Compl. ¶ 88.

    The third prong of the conspiracy concerns the exchange by defendants of

information on resident compensation and other terms of employment through surveys and

databases that plaintiffs allege has the purpose and effect of standardizing and stabilizing

compensation and other terms of employment.  See Compl. ¶¶ 73-82.  This exchange allegedly

occurs in two ways.  First, the AAMC annually surveys members of its COTH Section seeking

compensation levels for the employment year, aggregates the results into various categories and

distributes its findings in an annual report (the "COTH Survey" or "Survey").  See id. ¶¶ 74-79.

Second, hospitals and health systems access similar information through an electronic database

known as the Fellowship and Residency Electronic Interactive Database ("FREIDA"), which is

maintained by defendant American Medical Association ("AMA").  See id. ¶ 80.  Plaintiffs

allege that this exchange of information allows institutional defendants to fix resident salaries and benefits each year at depressed, anticompetitive levels.

Plaintiffs charge that the execution of the Match program, the enforcement of the ACGME-accreditation standards, and the coordinated collection and distribution of residency program compensation information together produce a significant depression of residents' salaries and working conditions by removing residents' ability to achieve enhanced salaries and working conditions through competition. See Compl. ¶¶ 92-96. Plaintiffs allege that defendants have violated Section 1 of the Sherman Act by contracting, combining and conspiring to unreasonably restrain trade and commerce. Plaintiffs filed this antitrust action as a proposed class action and have moved to certify both plaintiff and defendant classes. See Motion for Class Certification, filed November 3, 2003.

## II.   DEFENDANTS' RULE 12(b)(2) MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A.   *Rule 12(b)(2) Motions to Dismiss*

Sixteen institutional defendants and two organizational defendants, the ABMS and the Council of Medical Specialty Societies ("CMSS"), filed motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure.[1] Plaintiffs argue that the Court has jurisdiction over these non-resident defendants on three separate bases:

---

[1]    The institutional defendants that have moved to dismiss the complaint for lack of personal jurisdiction are Barnes Jewish-Hospital, Baylor College of Medicine, Beth Israel Deaconess Medical Center, Inc., Boston Medical Center Corp., Cedars-Sinai Medical Center, The Cleveland Clinic Foundation, Emory University, Rhode Island Hospital, Rush-Presbyterian-St. Luke's Medical Center, St. Louis University, Stanford Hospital & Clinics, Thomas Jefferson University Hospital, Inc., Administrators of the Tulane Educational Fund, University Hospitals of Cleveland, Inc., Washington University Medical Center and Yale-New Haven Hospital, Inc.

(1) jurisdiction under the District of Columbia long-arm statute; (2) jurisdiction under Section 12 of the Clayton Act, 15 U.S.C. § 22; and (3) jurisdiction pursuant to the long-arm statute under the "conspiracy jurisdiction" doctrine.

It is undisputed that plaintiffs bear the burden of establishing personal jurisdiction over each individual defendant and that in order to meet their burden, plaintiffs cannot rely on conclusory allegations.  See GTE New Media Services Inc. v. Ameritech Corp., 21 F. Supp. 2d 27, 36 (D.D.C. 1998), *remanded on other grounds sub nom*, GTE New Media Services Inc. v. BellSouth Corp., 199 F.3d 1343 (D.C. Cir. 2000).  Nor can plaintiffs aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant.  See Rush v. Savchuk, 444 U.S. 320, 331-32 (1980) (rejecting aggregation of co-defendants' forum contacts in determining personal jurisdiction because "the requirements of International Shoe must be met as to each defendant over whom a state court exercises jurisdiction").  In evaluating whether plaintiffs have established personal jurisdiction, the Court need not treat all of plaintiffs' allegations as true but instead "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts."  United States v. Philip Morris Inc., 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000).

In this instance, plaintiffs bear a special, higher burden in order to demonstrate jurisdiction because the parties have engaged in jurisdictional discovery.  "[A]lthough ordinarily a plaintiff need only establish a *prima facie* case that personal jurisdiction exists to survive a motion to dismiss, . . . in situations where the parties are permitted to conduct discovery on the jurisdictional issue a plaintiff must prove personal jurisdiction by a preponderance of the evidence."  Shapiro Lifschitz & Schram, P.C. v. Hazard, 24 F. Supp. 2d 66, 69 (D.D.C. 1998).

See also In re Vitamins Antitrust Litigation, 270 F. Supp. 2d 15, 20 (D.D.C. 2003) (citing

In re Vitamins Antitrust Litigation, Misc. No. 99-0197, 2001 U.S. Dist. LEXIS 25073, at *22

(D.D.C. Oct. 21, 2001)) ("Because plaintiffs have conducted jurisdictional discovery, they must

establish personal jurisdiction over defendants by a preponderance of the evidence.").

### B.    Section 13-423(a): The District of Columbia Long-Arm Statute

Plaintiffs assert that the Court has personal jurisdiction over the moving

defendants under three separate subsections of the District of Columbia long-arm statute,

Sections 13-423(a)(1), (3) and (4).  While the long-arm statute is interpreted broadly and factual

disputes are resolved in favor of plaintiffs, plaintiffs must allege some specific facts evidencing

purposeful activity by the defendants in the District of Columbia by which they invoked the

benefits and protections of the District's laws.  See Edmond v. United States Postal Service

General Counsel, 949 F.2d 415, 428 (D.C. Cir. 1991); First Chicago Int'l v. United Exchange

Co., Ltd., 836 F.2d 1375, 1378 (D.C. Cir. 1988); United States v. Philip Morris, Inc., 116 F.

Supp. 2d at 121.  In addition, because a court in the District of Columbia may exercise

jurisdiction over a non-resident defendant "only [for] a claim for relief arising from the specific

acts enumerated in [the statute] . . . ," D.C. CODE § 13-423(b), plaintiffs' jurisdictional

allegations must arise from the same conduct of which they complain.  See Willis v. Willis, 655

F.2d 1333, 1336 (D.C. Cir. 1981); Dooley v. United Technologies Corp., 786 F. Supp. 65, 71

(D.D.C. 1992); LaBrier v. A.H. Robins Co., Inc., 551 F. Supp. 53, 55 (D.D.C. 1982).

1.   "Transacting Business" under Section 13-423(a)(1)

Section 13-423(a)(1) of the long-arm statute provides that "a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's -- transacting any business in the District of Columbia." D.C. CODE § 13-423(a)(1).  To establish personal jurisdiction under this subsection, plaintiffs must demonstrate that (1) the defendant transacted business in the District; (2) the claim arose from the business transacted in the District; (3) the defendant had minimum contacts with the District; and (4) the Court's exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." Dooley v. United Technologies, 786 F. Supp. at 71; see also Novak-Canzeri v. Saud, 864 F. Supp. 203, 206 (D.D.C. 1994) (because of the "arising from" requirement of Section 13-423(b), "[t]he claim itself must have arisen from business transacted in the District or there is no jurisdiction").  Section 13-423(a)(1) of the long-arm statute permits the exercise of personal jurisdiction to the full extent permitted by the Due Process Clause of the Constitution.  See First Chicago Int'l v. United Exchange Co. Ltd., 836 F.2d at 1377; Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc., 355 A.2d 808, 810-11 (D.C. 1976) (en banc).

The constitutional touchstone of the due process determination is "whether the defendant purposefully established minimum contacts in the forum state." Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 108-09 (1987) (internal citations and emphasis omitted). On the other hand, as the Supreme Court recognized in Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) (emphasis in original), in today's commercial world business is often transacted solely by mail and wire communications across state lines and jurisdiction may

sometimes exist even if a defendant "did not *physically* enter the forum state."  The Court

explained that in such cases it is necessary to determine whether the commercial actor that is the

subject of the lawsuit "purposefully availed itself of the privilege of conducting business in the

forum state," and whether the defendant's conduct in connection with that state is such that it

"should reasonably anticipate being haled into court there."  Id. at 474-75 (internal citation and

quotation omitted).  When the "transacting business" analysis concerns a contractual relationship,

factors that inform the analysis include the nature of the prior negotiations between the parties,

the agreement's contemplated future consequences, the terms of the contract, the parties' actual

course of dealing and how each party manifested a connection to the forum.  See id. at 479;

Schwartz v. CDI Japan, Ltd., 938 F. Supp. 1, 6 (D.D.C. 1996)

a.    The Institutional Defendants

Plaintiffs generally allege that "each of the named Defendants and members of the

Defendant Class illegally contract, combine and conspire with persons and entities that have

committed, and continue to commit, overt acts within the District of Columbia in furtherance of

the contract, combination and conspiracy alleged in this Complaint."  Compl. ¶ 9.  Plaintiffs then

make the same generic claim with respect to each moving institutional defendant, alleging that

the "[institutional defendant] is a [non-District of Columbia] not-for-profit corporation with its

principal place of business [outside the District of Columbia].  [The institutional defendant]

sponsors medical residency programs, employing members of the Plaintiff Class.  [The

institutional defendant] has contracted, combined and conspired with the named Defendants to

restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this

Defendant participated took place in Washington, D.C." Id. ¶¶ 25-28, 30-32, 34, 40-43, 45-47,

49. The Court concludes that these generalized conclusory allegations alone are facially

insufficient to meet plaintiffs' jurisdictional burden. See GTE New Media Services Inc. v.

Ameritech Corp., 21 F. Supp. 2d at 36.

        In their opposition to defendants' motions to dismiss, plaintiffs attempt to

re-sculpt and refine these generalized allegations, asserting that the institutional defendants,

"through the intensely interactive NRMP web-site, [enter] into contracts in the District of

Columbia to secure employment of a significant and important portion of their work force,

provide a steady stream of information to the NRMP in order to effectuate the Match, and obtain

Match Results," thereby transacting business in the District of Columbia. Plaintiffs' Corrected

Memorandum of Points and Authorities in Support of Its Omnibus Opposition to Defendants'

Motions to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) ("Pls.' (b)(2) Opp.") at 36. It is

undisputed that Barnes Jewish-Hospital, Baylor College of Medicine, Beth Israel Deaconess

Medical Center, Inc., Boston Medical Center Corp., Cedars-Sinai Medical Center, The Cleveland

Clinic Foundation, Emory University, Rhode Island Hospital, Rush-Presbyterian-St. Luke's

Medical Center, St. Louis University, Stanford Hospital & Clinics, Thomas Jefferson University

Hospital, Inc., Administrators of the Tulane Educational Fund, University Hospitals of

Cleveland, Inc. and Yale-New Haven Hospital, Inc. each annually participates in the Match by

contracting to participate in the program, submitting its preference list to the NRMP, which

operates from the AAMC's office in the District of Columbia, and receiving the results of the Match upon its completion.[2]

        Six of these institutional defendants admit that they have "sporadic" contacts with the NRMP in connection with the Match in addition to the annual submission of the institution's Match list.[3] The remaining institutional defendants that participate in the Match assert that they interact with the NRMP only once a year when they transmit their preference lists to the organization. These assertions are contradicted, however, by plaintiffs' documentation of certain contacts with the NRMP in connection with the Match during 1999-2001. These additional

---

[2]      Washington University Medical Center asserts that contrary to plaintiffs' complaint it does not participate in the Match. See Supplemental Memorandum of Law in Support of Defendant Washington University Medical Center's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Brian Phillips ¶ 4. Plaintiffs do not refute this statement.

[3]      See Supplemental Memorandum of Points and Authorities in Support of Defendant Barnes-Jewish Hospital's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Terra Mouser ¶ 2 ("Barnes-Jewish Hospital also has sporadic contact with the NRMP's technical support staff"); Supplemental Memorandum in Support of Defendant Baylor College of Medicine's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Ralph D. Feigin ¶ 4 (interactions include transmission of resident names, telephone calls to NRMP to address electronic submission problems, receipt of periodic emails and packages from NRMP); Supplemental Memorandum of Points and Authorities in Support of Defendant Emory University's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of James R. Zaidan, M.D., M.B.A ¶ 3 (defendant "has sporadic contact with the NRMP's technical support staff"); Memorandum of Law in Support of Defendant Rush Presbyterian St. Luke's Medical Center's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Thomas A. Deutsch ¶ 4 (defendant "has sporadic contact with the NRMP's technical support staff"); Supplemental Memorandum of Points and Authorities in Support of Defendant Stanford Hospital & Clinics' Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Ann M. Dohn ¶ 3 (defendant "has sporadic contact with the NRMP's technical support staff"); Supplemental Memorandum of Points and Authorities in Support of Defendant Tulane's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2); Declaration of Edward F. Foulks, M.D., Ph.D. ¶ 3 (defendant "has sporadic contact with the NRMP's technical support staff").

contacts include the submission of quota change forms, updates of institutional information,

information and association data forms and/or "reversion" of unfilled position forms.  Plaintiffs

concede that no one institution submitted more than ten of these communications to the NRMP

in any given year.  See Pls.' (b)(2) Opp., Ex. 11, Defendant NRMP's Objections and Answers to

Plaintiff Paul Jung's First Set of Interrogatories on Jurisdiction; Schedule II.B.,

"Communications from Institutions/Programs to the NRMP -- 2001 Residency Match;" Schedule

III.B, "Communications from Institutions/Programs to the NRMP -- 2000 Residency Match;" and

Schedule IV.B, "Communications from Institutions/Programs to the NRMP -- 1999 Residency

Match."  It is these additional contacts on which plaintiffs base their assertion that in providing a

steady stream of information into the District of Columbia in order to effectuate the Match, the

moving institutional defendants "transacted business" to an extent sufficient to provide

jurisdiction under Section 13-423(a)(1) of the long-arm statute.

    The Court concludes that the fact that the moving institutional defendants entered

into the Institutional Match Contract and communicated information concerning their individual

programs to the NRMP up to ten times a year in order to effectuate an accurate Match does not

by itself form a basis for personal jurisdiction.  See Far West Capital, Inc. v. Towne, 46 F.3d

1071, 1076-77 (10th Cir. 1995) (non-forum defendant's phone calls and ten to twenty faxes to in-

forum plaintiff during course of contract negotiation were insufficient to establish minimum

contacts under transacting business prong of state long-arm); see also Wien Air Alaska, Inc. v.

Brandt, 195 F.3d 208, 213 (5th Cir. 1999) (defendant's numerous communications into forum

cannot serve as basis of jurisdiction if they do not themselves form basis of complaint).[4]  The

Court must focus on the quality of the contacts rather than their quantity.  See Mouzavires v.

Baxter, 434 A.2d 988, 995 (D.C. 1981) (en banc) ("notions of fundamental fairness require that

the defendant's contacts with the forum be evaluated qualitatively rather than quantitatively" in

assessing "transacting business" prong of long-arm statute).

    Upon consideration of the contacts alleged in plaintiffs' complaint, the Court

concludes that the contacts simply are not of the quality that would support a conclusion that the

institutional defendants have "purposefully availed [themselves] of the privilege of conducting

business in the forum state," such that they "should reasonably anticipate being haled into court"

here under Section 13-423(a)(1).  Burger King Corp. v. Rudzewicz, 471 U.S. at 474-75.[5]  First,

no prior negotiation of the Institutional Match Contract between any institution and the NRMP

took place at all, let alone in the District of Columbia; the contract is a form contract into which

the institutional defendants entered by listing their names and the number of residency positions

---

[4]   Taking plaintiffs' argument to its logical conclusion, a forum-based entity could
ensure that the Court had jurisdiction over any non-forum contracting party merely by requesting
that the non-forum party provide any information necessary to execute the contract in intervals.
See Health Communications, Inc. v. Mariner Corp., 860 F.2d 460, 463 (D.C. Cir. 1988).

[5]   Plaintiffs' discussion of personal jurisdiction predicated on a defendant's contact
with a forum via an interactive web site is a red herring.  Those cases cited by plaintiffs address
the question of whether a defendant, by maintaining its own interactive web site that is accessible
to or directed towards a specific jurisdiction, makes itself vulnerable to suit within that forum.
See Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 513 (D.C. Cir. 2002); Blumenthal v.
Drudge, 992 F. Supp. 44, 53 (D.D.C. 1998).  Here, plaintiffs cite to the defendants' use of a
co-defendant's web site for the purpose of sending information into the District in connection
with the execution of the Match.  As the Court concludes, however, such communications to the
NRMP, whether in electronic or in written form, are insufficient to demonstrate that the
institutional defendants purposefully availed themselves of the privileges and the responsibilities
of conducting business in the District of Columbia.

they had available.  See Omnibus Reply Memorandum in Support of Motions by Various

Defendants to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(2), Ex. O, NRMP

Institutional Agreement.  Second, it is not contested that the future consequence of the

Institutional Match Contract for the moving institutional defendants was the placement of

residents with those defendants *outside* the District of Columbia; the execution of the contract

did not result in any continuing connections with the District.  Compare Burger King Corp. v.

Rudzewicz, 471 U.S. at 480 (contract executed in forum "envisioned continuing and wide-

reaching contacts with [plaintiff] in the forum").

        Third, no terms in the Institutional Match Contract itself indicate any special

connection with the District of Columbia.  The only indication at all that the Match occurred in

the District of Columbia is the listing of the NRMP's Washington, D.C. address on the face of

the contract.  Fourth, the contract includes a choice-of-law provision designating Illinois law.

While this by no means conclusively demonstrates that defendants are beyond the Court's

jurisdictional reach, it does inform the assessment of whether the defendants could have

reasonably foreseen being involved in litigation in the District of Columbia concerning the

execution of the Institutional Match Contract.  See Burger King Corp. v. Rudzewicz, 471 U.S. at

482.

        Finally, there is nothing in the parties' actual course of conduct that indicates that

the moving institutional defendants should have reasonably foreseen being subject to the

jurisdiction of this Court.  There is no debate that the Match is very important to the institutional

defendants' business of providing health care; it is the mechanism by which the institutional

defendants hire resident doctors.  The NRMP is not involved, however, in the hospitals'

substantive process of evaluating potential residents prior to submission of the preference lists.

Nor does the NRMP continue to play a role in the hospitals' business once the Match is

completed or in any other fashion exert control over the rest of the hospitals' affairs. The mere

fact that the NRMP, with its principal place of business in the District of Columbia, entered into

a contract with others cannot "standing alone" provide jurisdiction over those other contracting

parties. See Health Communications, Inc. v. Mariner Corp., 860 F.2d at 462 (citing Burger King

Corp. v. Rudzewicz, 471 U.S. at 482) (no jurisdiction absent demonstrated integration of parties'

businesses or continued influence of forum resident over non-resident defendant,

notwithstanding fact that contract was partially performed in forum); Mouzavires v Baxter, 434

A.2d at 995 (proper application of minimum contacts formula requires consideration "not only of

whether a nonresident defendant has sufficient contacts with the forum, but also of whether those

contacts are voluntary and deliberate, rather than fortuitous").

      Plaintiffs rely heavily on Schwartz v. CDI Japan, Ltd. in support of their

jurisdictional argument. Plaintiffs are correct that the Court in Schwartz stated that "[t]he

'transacting any business' provision of the District's long-arm statute embraces the contractual

activities of a non-resident defendant that cause repercussions in the District" and that "[i]t is

'therefore sufficient . . . that the suit [be] based on a contract that [has] [a] substantial connection

with the District." Schwartz v. CDI Japan, Ltd., 938 F. Supp. at 5 (quoting Mouzavires v.

Baxter, 434 A.2d at 992). Plaintiffs fail to recognize, however, that the defendant's contacts with

the District of Columbia in Schwartz were much more extensive than those of the moving

institutional defendants here. In Schwartz, the foreign defendant not only had assumed a contract

with the Smithsonian Institution's National Museum of American Art ("NMAA"), but also had

-15-

assumed any additional contracts entered into by the defendant's former agent with the museum, which indicated the defendant's continuing "[intention] to reap the financial benefits from transacting business [with the NMAA] in this forum." Schwartz v. CDI Japan, Ltd., 938 F. Supp. at 7. Furthermore, the assumed contract expressly designated the District of Columbia as the site of the execution of the contract, called for the delivery of products to the Smithsonian in the District of Columbia, and required the defendant to make payments and reimbursements to the NMAA into a District of Columbia bank account. See id. at 6. In addition, an agent of the non-resident defendant had negotiated the assumed contract in the District. See id. at 8. No similar contacts with the forum of this quality exist in the instant circumstances.

The Court therefore concludes that the moving institutional defendants' entry into the Institutional Match Contract, and the accompanying electronic and/or mail correspondence those defendants sent into the District in support of the contract, do not and cannot provide a basis for personal jurisdiction under Section 13-423(a)(1) of the long-arm statute.

### b.   The Organizational Defendants

Aside from the conclusory, generalized allegations in the complaint concerning "defendants," which the Court already has found insufficient to meet the pleading standards for personal jurisdiction over the institutional defendants in Section II(B)(1)(a), *supra*, plaintiffs provide scant additional support for their jurisdictional claim that the ABMS or the CMSS transacts business in the District of Columbia for the purposes of the long-arm statute. In their complaint, plaintiffs introduce the ABMS as "an Illinois not-for-profit corporation whose membership consists of 24 recognized medical specialty certification boards in the United

States" that "develop and apply professional and education standards for the evaluation and certification of physician specialists." Compl. ¶ 20. Plaintiffs also allege that the ABMS is one of five "governing sponsors" of the NRMP. Id. With respect to the CMSS, plaintiffs allege that it is "a not-for-profit corporation whose membership consists of 17 physician societies in specialties having a member board participating in ABMS" and that it also is one of five "governing sponsors" of the NRMP. Id. ¶ 21.

Plaintiffs do not define "governing sponsor" in their complaint. In their opposition to defendants' motions to dismiss, plaintiffs cite to statements by the Executive Director of the NRMP, Robert L. Beran, Ph.D., that the ABMS and the CMSS are two of five "sponsors" of the NRMP. Pls.' (b)(2) Opp. at 30 (citing Defendant National Resident Matching Program's Motion to Dismiss and Compel Arbitration, Ex. A, Affidavit of Robert L. Beran, Ph.D. ("Beran Compel Aff.") ¶ 1). Plaintiffs assert that the ABMS thus itself "admits" that it is a sponsor of the NRMP, that its representative serves as President of the NRMP and that its representative telephones the NRMP several times a month. Plaintiffs also assert that the CMSS admits to its "involvement" with the NRMP and has "contacts with the District of Columbia." Pls.' (b)(2) Opp. at 30. Plaintiffs charge that the relationships between these two organizational defendants and the NRMP are "ongoing and committed [, and] as sponsors, [the ABMS and the CMSS] are entitled to and do elect two members to the twelve member NRMP Board of Directors." Id. at 36. From this predicate, plaintiffs argue that "the two moving Organizational Defendants play an integral role in governing the NRMP, [and in] formulating its policies, including the anti-competitive policies of the Match," and that they therefore are subject to suit in the District of Columbia under Section 13-423(a)(1). Id.

The ABMS and the CMSS offer support for their motions to dismiss in the form of sworn declarations from their Executive Vice President and President, respectively. Each states that his organization does not elect members to the NRMP board, but instead nominates individuals from the organization to serve; the NRMP board itself elects its members. See Declaration of Stephen H. Miller, M.D., Ph.D., in Support of Motion of the American Board of Medical Specialties to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(2) ("Miller Decl.") ¶ 6; Declaration of Bruce E. Spivey, M.D., in Support of Motion of the Council of Medical Specialty Societies to Dismiss the Complaint ("Spivey Decl.") ¶ 6. In addition, Dr. Spivey states that the CMSS nominees to the NRMP board are not officers or employees of the CMSS and do not act on the CMSS's behalf. See Spivey Decl. ¶ 6. While it may be that nomination is tantamount to election, both Dr. Miller and Dr. Spivey state that their respective organizations do not exercise any control over the activities of the NRMP after their organizations' nominees are elected to the NRMP board. See Miller Decl. ¶ 6; Spivey Decl. ¶ 6. In a separate affidavit, the Executive Director of the NRMP confirmed that "the sponsoring organizations only have the right to nominate. Election of new board members is left to the discretion of the current Board. The sponsoring organizations *have no other power* with respect to the NRMP." Beran Compel Aff. ¶ 3 (emphasis added). Furthermore, while Dr. Miller is both Executive Vice President of the ABMS and President of the NRMP, he states that all the business he conducts with NRMP personnel, which includes several telephone conversations a month and travel once or twice a year to the District of Columbia, is in his capacity as NRMP

President and not on behalf of the ABMS.  <u>See</u> Miller Decl. ¶ 7.  These statements in

declarations and affidavits offered in support of defendants' motions remain uncontradicted by

plaintiffs.

    The Court concludes that plaintiffs have not alleged sufficient facts to

demonstrate that either the ABMS or the CMSS transacts business in the District of Columbia for

purposes of the long-arm statute.  Plaintiffs' only true jurisdictional claim rests on the fact that

these organizational defendants are "governing sponsors" of the NRMP and nominate two

directors to the NRMP board.  Because plaintiffs do not define "governing sponsor," the Court is

left to consider what that term may mean.  In light of plaintiffs' assertion that as governing

sponsors the organizational defendants have the power to direct policy and determine procedures

of the NRMP, perhaps the most analogous relationship is that of a parent corporation with

control over the activities of its subsidiary.  <u>See</u>, <u>e.g.</u>, <u>El-Fadl v. Central Bank of Jordan</u>, 75 F.3d

668, 676 (D.C. Cir. 1996) ("[I]f parent and subsidiary 'are not really separate entities,' . . . or one

acts as an agent of the other, . . . the local subsidiary's contacts can be imputed to the foreign

parent.").  If this is the most analogous relationship, however, it does not serve plaintiffs well.

Plaintiffs fail to allege a sufficient level of control by the ABMS and/or the CMSS over the

NRMP, and the uncontradicted declarations submitted by Dr. Miller and Dr. Spivey state

unequivocally that their organizations do not exercise any control over the activities of the

NRMP.  The Court therefore has no basis to attribute the activity of the NRMP in the District of

Columbia to either organization.[6]

---

    [6]  With further respect to the fact that Dr. Miller serves both as President of the
NRMP and Executive Vice President of the ABMS, plaintiffs have not disputed Dr. Miller's
declaration that any actions he took in the District of Columbia were in his capacity as President

2.     Sections 13-423(a)(3) and (4): Tortious Injury

Section 13-423(a)(3) of the long-arm statute confers jurisdiction over a person

who causes "tortious injury in the District of Columbia by an act or omission in the District of

Columbia." D.C. CODE § 13-423(a)(3). To invoke this subsection, plaintiffs must show that the

moving defendants either directly or through an agent caused tortious injury to plaintiffs in the

District of Columbia by an act or omission in the District of Columbia. See Richard v. Bell

Atlantic Corp., 946 F. Supp. 54, 73 (D.D.C. 1996); see generally Moncrief v. Lexington Herald-

Leader Co., 807 A.2d 217, 219 (D.C. 1986).

Section 13-423(a)(4) of the long-arm statute provides:

> A District of Columbia court may exercise personal jurisdiction
> over a person, who acts directly or by an agent, as to a claim for
> relief arising from the person's . . . causing tortious injury in the
> District of Columbia by an act or omission outside the District of
> Columbia if he regularly does or solicits business, engages in any
> other persistent course of conduct, or derives substantial revenue
> from goods used or consumed or services rendered, in the District
> of Columbia.

D.C. CODE § 13-423(a)(4). In order to establish personal jurisdiction under this subsection after

jurisdictional discovery has taken place plaintiffs must demonstrate by a preponderance of the

evidence that (1) plaintiffs suffered a tortious injury in the District of Columbia; (2) the injury was

caused by a defendant's act or omission outside of the District; and (3) the defendant had one of

_____

of the NRMP and not in his capacity as Executive Vice President of the ABMS. The presence of
Dr. Miller as an officer of both organizations, without additional allegations that the steps Dr.
Miller took nominally as NRMP President were in fact taken on behalf of the ABMS, is
insufficient to demonstrate jurisdiction over the ABMS. See United States v. Bestfoods, 524
U.S. 51, 69-70 (1998); Doe v. Unocal Corp., 248 F.3d 915, 925-26 (9th Cir. 2001) (applying
United States v. Bestfoods in specific jurisdiction context); In re Vitamins Antitrust Litigation,
270 F. Supp. 2d at 26.

the three enumerated contacts with the District of Columbia.  See Crane v. Carr, 814 F.2d 758,

762-63 (D.C. Cir. 1987); Blumenthal v. Drudge, 992 F. Supp. at 53; Trager v. Berrie, 593 F.

Supp. 223, 225 (D.D.C 1984).[7]

   Under both "tortious injury" subsections of the long-arm statute plaintiffs must

allege that they have suffered a tortious injury in the District of Columbia.  In their complaint,

plaintiffs allege no injury to the named plaintiffs within the District of Columbia.  In their

opposition to defendants' motion to dismiss, plaintiffs attempt to describe an injury, citing to

allegations in the complaint that the defendants' actions restrained competition in the recruitment,

hiring, employment and compensation of resident physicians nationwide.  Because the District of

Columbia is part of the alleged national relevant market in which competition was restrained,

plaintiffs argue that they lost "the right to negotiate with employers in the District of Columbia for

placement as resident physicians" as a result of the alleged anticompetive activity.  Pls.' (b)(2)

Opp. at 37-38.  Plaintiffs have failed, however, to allege or otherwise demonstrate any facts that

any named plaintiff pursued or would have pursued a resident position within the District of

Columbia by ranking or interviewing with a District of Columbia hospital, or undertook any other

action in connection with residency employment in the District.  Absent such allegations,

---

[7]  Then Circuit Judge Ruth Bader Ginsburg described these three contacts as the
"plus factors," factors that demonstrate some "reasonable connection" between the jurisdiction in
which the court sits "separate from and in addition to" the injury caused in the jurisdiction.
Crane v. Carr, 814 at 762.  The "plus factor" or factors "need not be related to the act that caused
the injury; all that is required is 'some other reasonable connection' between the defendant and
the forum."  Id. at 762-63.  The "plus factor" does not itself provide the basis for jurisdiction --
the injury does -- but "it does serve to filter out cases in which the in-forum impact is an isolated
event and the defendant otherwise has no, or scant, affiliation with the forum."  Id. at 763.  See
also Blumenthal v. Drudge, 992 F. Supp. at 54 (under Section 13-423(a)(4), the injury -- not the
enumerated contacts -- "provides the basis for jurisdiction").

plaintiffs' argument fails. There has been no tortious injury to any plaintiff in the District of

Columbia. If the Court were to find jurisdiction under this flawed premise, any plaintiff alleging

an antitrust conspiracy could satisfy the tortious injury requirement under either "tort" prong of

the long-arm statute simply by asserting that the District of Columbia is part of the relevant

market.[8]

        At oral argument, plaintiffs argued belatedly that the injury was the Match itself --

that is, that the injury is the actual binding of the fourth year medical student to a specific

residency program -- and thus the tortious injury occurred in the District of Columbia where the

Match is executed. See Transcript of February 23, 2003 Motions Hearing, Afternoon Session

("Tr.") at 41 ("As soon as that rank order list is submitted, and the algorithm employed, and that

match is made, that is the injury."). Without reaching the merits of this "injury" claim, the Court

rejects this line of reasoning in light of the plaintiffs' own assertion in their complaint and briefs

that plaintiffs are bound and thus, by extension, injured upon entry into the Student Match

Contract rather than upon the execution of the contract. See Compl. ¶ 86(b); Pls.' (b)(2) Opp. at 6

n.4 ("[M]edical school seniors who sign up for the Match agree that they will accept the position

to which they are matched if a match is made, and will enroll in the residency program to which

they are matched by the NRMP. 'The listing of [. . .] a program by an applicant on the

_____

[8]    While some putative class members likely pursued employment in the District, defendants are correct that plaintiffs cannot rely on alleged injury to putative plaintiffs in order to meet the in-District injury requirement. See Selman v. Harvard Medical School, 494 F. Supp. 603, 621 (S.D.N.Y. 1980), aff'd without opinion, 636 F.2d 1204 (2d Cir. 1980) (plaintiff's contention that "injuries and facts relevant to other members of the class should be used in determining jurisdiction" was rejected because "the named representative himself must satisfy all jurisdictional prerequisites before the action can go forward"); accord Williams v. Firstplus Home Owner Loan Trust 1996-2, 209 F.R.D. 404, 413 (W.D. Tenn. 2002); Barry v. Mortgage Servicing Acquisition Corp., 909 F. Supp. 65, 74-75 (D.R.I. 1995).

individual's Rank Order List establishes a commitment to [. . .] accept an appointment when a

match results.'") (quoting NRMP Handbook for Institutions and Program Directors at 4-5). There

are no allegations that plaintiffs were in the District of Columbia when they entered into the

Student Match Contract. The Court concludes that plaintiffs' allegations are insufficient to

demonstrate any tortious injury in the District of Columbia, and therefore that jurisdiction cannot

be predicated on Section 13-423(a)(3) or (4) of the long-arm statute.

    C.   *Personal Jurisdiction under Section 12 of the Clayton Act: "Transacting Business"*

        Plaintiffs assert that the Court has jurisdiction over all the moving defendants

under the jurisdictional grant of Section 12 of the Clayton Act. See Compl. ¶ 7. Section 12 states

that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be

brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein

it may be found or transacts business; and all process in such cases may be served in the district of

which it is an inhabitant, or wherever it may be found." 15 U.S.C. § 22.

        In determining whether jurisdiction over defendants exists under the Clayton Act,

the Court must assess "whether the corporation is doing business in the district of any substantial

character, even if its business is entirely interstate in character and is transacted by agents who do

not reside in the District." Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping

Authority, 475 F. Supp. 711, 716 (D.D.C. 1979). See also Mylan Laboratories, Inc. v. Akzo,

N.V., Civil Action No. 89-1671, 1990 U.S. Dist. LEXIS 3521, at *21 (D.D.C. Mar. 27, 1990);

Chrysler Corp. v. General Motors Corp., 589 F. Supp. 1182, 1195 (D.D.C. 1984). The Court must

look for "tangible manifestations of doing business" in the District of Columbia, such as the

presence of officers, employees, agents, offices, ownership of property, maintenance of corporate records or bank accounts.  Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority, 475 F. Supp. at 716.  Unlike the "transacting business" analysis conducted under the District of Columbia long-arm statute, jurisdiction under Section 12 does not require that the transactions on which jurisdiction is based be related to the cause of action underlying the suit. See Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc., 268 F. Supp. 2d 1, 10 (D.D.C. 2003) (quoting Chrysler Corp. v. General Motors Corp., 589 F. Supp. at 1195).

1.    The Institutional Defendants

Plaintiffs do not allege any tangible manifestations of doing business in the District of Columbia on the part of the moving institutional defendants.  Instead, they invite the Court to consider the institutional defendants' participation in the Institutional Match Contract, the COTH Survey and activities related to the institutions' membership in the AAMC.  See Pls.' (b)(2) Opp. at 44 ("[E]ach of the moving Institutional Defendants enter into multiple agreements with the D.C.-based NRMP and AAMC to perform highly prized services which require regular and on-going contacts with each of the D.C.-based entities, and the Institutional Defendants pay fees into the District of Columbia for those services.").

It is undisputed that Barnes-Jewish Hospital, Beth Israel Deaconess Medical Center, Inc., Boston Medical Center Corp., Cedars-Sinai Medical Center, The Cleveland Clinic Foundation, Emory University, Rhode Island Hospital, Rush-Presbyterian-St. Luke's Medical Center, St. Louis University, Stanford Hospital & Clinics, Thomas Jefferson University Hospital, Inc., Administrators of the Tulane Educational Fund, University Hospitals of Cleveland, Inc. and

Yale-New Haven Hospital, Inc. participated in the Match and in the annual COTH Survey by submitting the institutions' resident stipend data to the AAMC, and by receiving the results of the Survey in return.[9]

In addition to participating in the Match and the COTH Survey, a majority of the moving institutional defendants admit that they or their employees had additional contacts with the District of Columbia. First, The Cleveland Clinic Foundation states that it employs one lobbyist who travels to the District of Columbia "solely for the purpose of lobbying the federal agencies and government," but asserts that such actions are protected by the government contacts exception. Defendant The Cleveland Clinic Foundation's Supplemental Memorandum of Points and Authorities in Support of Its Motion and the Omnibus Memorandum in Support of Motions by Various Defendants to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2) at 6 n.3. Second, Beth-Israel Deaconess Medical Center, Inc., Boston Medical Center Corp., Cedars-Sinai Medical Center, Rhode Island Hospital, Thomas Jefferson University Hospital, Inc., University Hospitals of Cleveland, Inc. and Yale-New Haven Hospital, Inc. acknowledge that they employ individuals who are members of organizations such as defendant American Hospital Association

---

[9]     There are three institutions that challenge plaintiffs' allegation that they participate in the COTH Survey. See Supplemental Memorandum of Law in Support of Defendant Washington University Medical Center's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Brian Phillips ¶ 4; Supplemental Memorandum in Support of Defendant Baylor College of Medicine's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Ralph D. Feigin ¶ 5; Supplemental Memorandum of Points and Authorities in Support of Defendant Tulane's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Supplemental Declaration of Edward F. Foulks, M.D., Ph.D. ¶ 2. Beth Israel Deaconess states that it has not participated in the COTH Survey since 1999. See Supplemental Memorandum in Support of Defendant Beth Israel Deaconess Medical Center's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Paul F. Levy ¶ 4.

("AHA"), the AAMC and/or the COTH Section and that these employees travel to the District of Columbia to fulfill their obligations to such organizations.[10]

Third, Baylor College of Medicine acknowledges that it has had two additional contacts with the District:  specifically that it contracted with a firm that provides services concerning relations with the federal government, and that certain Baylor residents each year attend a program conducted in the District of Columbia by the United States Department of Defense.  See Supplemental Memorandum in Support of Defendant Baylor College of Medicine's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2) at 3 n.2.  Finally, the Administrators of the Tulane Educational Fund admits that it has one assistant professor who "is providing technical advice concerning infectious disease programs in Africa pursuant to a subcontract for the United States Agency for International Development (USAID).  This employee

---

[10]     See Supplemental Memorandum in Support of Defendant Beth Israel Deaconess Medical Center's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Paul F. Levy ¶ 4; Supplemental Memorandum in Support of Defendant Boston Medical Center's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of John B. Chessare, M.D. ¶ 4; Defendant Cedars-Sinai's Supplemental Memorandum of Points and Authorities in Support of Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Thomas M. Priselac ¶ 6 (President and Chief Executive Officer in individual capacity is member of AHA and Chair of COTH Administrative Board; travels to the District four to six times a year to fulfill related obligations); Supplemental Memorandum of Law in Support of Defendant Rhode Island Hospital's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Joseph F. Amaral ¶ 4; Defendant Thomas Jefferson University Hospital's Motion to Dismiss the Complaint, Declaration of Thomas J. Lewis ¶ 4 (President and Chief Executive Officer travels on behalf of defendant to District four times a year to fulfill obligations related to membership in AHA and COTH); Supplemental Memorandum in Support of Defendant University Hospitals of Cleveland, Inc.'s Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of John Ferry, M.D. ¶ 7 (employees travel to District of Columbia in individual capacities as members of professional or industry organizations); Supplemental Memorandum of Law in Support of Defendant Yale-New Haven Hospital's Motion to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2), Declaration of Joseph A. Zaccagnino ¶ 4 (employees travel to District of Columbia in individual capacities as members of professional or industry organizations).

-26-

works out of a private nonprofit organization that is the prime contractor to USAID."
Supplemental Memorandum of Points and Authorities in Support of Defendant Tulane's Motion
to Dismiss the Complaints Pursuant to Fed. R. Civ. P. 12(b)(2); Declaration of Anthony P.
Lorino ¶ 4.

        To the extent that the moving institutional defendants admit to their agents'
presence in the District of Columbia in order to lobby certain agencies of the federal government
on the defendants' behalf, such contacts with the District are excluded from the jurisdictional
analysis under the "government contacts" exception.  Under this exception, a person or company
does not subject itself to the jurisdiction of the courts of the District of Columbia merely by filing
an application with a government agency or by seeking redress of grievances from the Executive
Branch or the Congress.  See Naartex Consulting Corp. v. Watt, 722 F.2d 779, 787 (D.C. Cir.
1983); Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc., 355 A.2d at 813.
"The District of Columbia's unique character as the home of the federal government requires this
exception in order to maintain unobstructed access to the instrumentalities of the federal
government."  Cellutech, Inc. v. Centennial Cellular Corp., 871 F. Supp. 46, 50 (D.D.C. 1994).
See also Mallinckrodt Medical, Inc. v. Sonus Pharmaceuticals, Inc. 989 F. Supp. 265, 271 (D.D.C.
1998).

        The Court also concludes that the institutional defendants' membership in and
contacts with the AAMC or the COTH Section in the District of Columbia should not be
considered in the evaluation of whether any defendant transacted business of any "substantial
character" in the District because it is established that the "government contacts" exception
extends "to non-resident contact with trade associations located with [sic] the District of

Columbia." World Wide Minerals, Ltd. v. Republic of Kazakhstahn, 116 F. Supp. 2d 98, 105-06 (D.D.C. 2000). The AAMC is a typical association for these purposes; it is "a non-profit association founded [] to work for reform in medical education" and "[a]s an association of medical schools, teaching hospitals, and academic societies, the AAMC works with its members to set a national agenda for medical education, biomedical research, and health care, and assists its members by providing services at the national level that facilitate the accomplishment of their missions." See Omnibus Reply Memorandum in Support of Motions by Various Defendants to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(2), Ex. F, "About the AAMC." Any travel to the District by an institutional defendant's agent for the purpose of fulfilling the membership obligations of the institution in the AAMC or the COTH Section therefore does not subject the defendant to the jurisdiction of the Court. See World Wide Minerals, Ltd. v. Republic of Kazakhstahn, 116 F. Supp. 2d at 105-06; American Association of Cruise Passengers v. Cunard Line, Ltd., 691 F. Supp. 379, 380 (D.D.C. 1987) ("attendance at a trade association meeting [. . .] does not constitute 'transacting business'" under the long-arm statute).

        The Court thus is left to consider only plaintiffs' allegations with respect to the institutional defendants' participation in the Match Program and the COTH Survey, and the *de minimis* contacts admitted by Baylor College of Medicine and the Administrators of the Tulane Educational Fund with respect to those institutions. The Court concludes that these contacts are not sufficient to provide personal jurisdiction over the moving institutional defendants under Section 12 of the Clayton Act. While plaintiffs attempt to construe the COTH Survey as a service contracted for by the institutional defendants with the AAMC in the District of Columbia, plaintiffs allege in their complaint that the Survey is administered and published by the AAMC

-28-

and not at the behest of any individual hospital.  <u>Compare</u> Pls.' (b)(2) Opp. at 18-19 <u>with</u> Compl.

¶ 74.  Although institutional defendants provide their individual information to the AAMC and

the results of the Survey are distributed by the AAMC to its members, the institutional defendants

are not required to provide information in order to receive the Survey.  In fact, the Survey is

available to the public at large.  <u>See</u> http://www.aamc.org/hlthcare/coth-hss.start.htm.  Upon

consideration of plaintiffs' allegations with respect to the COTH Survey, alone or in conjunction

with the allegations regarding the Institutional Match Contract and/or the *de minimis* allegations

in the complaint described above, the Court concludes that any amalgamation of these contacts

with the District of Columbia fails to demonstrate that any of the moving institutional defendants

is doing business in the District "of any substantial character," thereby justifying jurisdiction

under the Clayton Act.  <u>See</u> <u>Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping</u>

<u>Authority</u>, 475 F. Supp. at 716.[11]

## 2.   The Organizational Defendants

Plaintiffs do not allege any additional contacts with the District of Columbia that

would subject the moving organizational defendants to the Court's jurisdiction in addition to

those evaluated in the Court's "transacting business" analysis under Section 13-423(a)(1) of the

long-arm statute.  For the reasons stated in Section II(B)(1)(b), *supra*, the Court therefore

concludes that plaintiffs have failed to demonstrate that the ABMS or the CMSS has transacted

"substantial business" within the District of Columbia.

---

[11]      For the reasons stated in Section II(B)(1)(a), *supra*, the moving institutional
defendants' contacts with the District of Columbia in connection with the Institutional Match
Contract are insufficient by themselves to demonstrate that the defendants conducted "substantial
business" within the District.

D.    *"Conspiracy Jurisdiction" Under the Long-Arm Statute*

Plaintiffs assert that the Court has jurisdiction over all the moving defendants pursuant to the "conspiracy" theory of long-arm jurisdiction.  Under this doctrine, acts undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy may subject a non-resident co-conspirator to personal jurisdiction under the long-arm statute.  See Second Amendment Foundation v. United States Conference of Mayors, 274 F.3d 521, 524  (D.C. Cir. 2001) (citing Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1030-31 (D.C. Cir. 1997)) (applying conspiracy theory of personal jurisdiction to long-arm statute's "transacting business" subsection); First Chicago Int'l v. United Exch. Co., 836 F.2d at 1377-78; Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d at 424-425 (discussing application of conspiracy theory under Section 13-423(a)(3)).

Plaintiffs claim that personal jurisdiction exists over each moving defendant pursuant to the conspiracy theory of jurisdiction stemming from Section 13-423(a)(1).  See Pls.' (b)(2) Opp. at 24-30.[12]  Conspiracy jurisdiction under this subsection presumes that "[p]ersons who enter the forum and engage in conspiratorial acts are deemed to 'transact business' there 'directly'; [and] coconspirators who never enter the forum are deemed to 'transact business' there 'by an agent.'"  Second Amendment Foundation v. United States Conference of Mayors, 274 F.3d at 523 (quoting D.C. CODE § 13-423(a)(1)).  So long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal

---

[12]     Plaintiffs also claim conspiracy jurisdiction pursuant to Sections 13-423(a)(3) and (4), but their failure to allege an in-forum injury defeats any conspiracy jurisdiction claim based on these subsections.  See Section II(B)(2), *supra*.

jurisdiction over all members of the conspiracy.  See Dooley v. United Technologies Corp., 786 F. Supp. at 78.  In this context, plaintiffs must allege (1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries.  See Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d at 425.

"Mere speculation" that a conspiracy exists or that "the non-resident defendants are co-conspirators [is] insufficient to meet plaintiff's [] burden."  Dooley v. United Technologies Corp., 786 F. Supp. at 78.  A plaintiff resting on the conspiracy theory of jurisdiction "must plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy."  Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d at 1031 (internal quotation omitted).  See also United States v. Philip Morris Inc., 116 F. Supp. at 122.  This requirement is strictly enforced, and courts in this Circuit have applied the conspiracy jurisdiction theory "warily" in light of concerns that plaintiffs will use the doctrine to circumvent the constitutional boundaries of the long-arm statute.  Dooley v. United Technologies Corp., 786 F. Supp. at 77.  As Judge Silberman said in his concurring opinion in Edmond, "we cannot allow plaintiffs to subvert the important constitutional principles of sovereignty and due process that underlie personal jurisdiction limitations with mere unspecified and unsubstantiated claims that multifarious defendants were part of a broad conspiracy and that one of them committed some [act] in the plaintiffs' desired forum."  Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d at 428 (Silberman, J, concurring) (internal quotation omitted).  See also United States v.

Philip Morris Inc., 116 F. Supp. 2d at 122; In re Vitamins Antitrust Litigation, 2001 U.S. Dist.

LEXIS 25073, at *46.[13]

        In addition, once jurisdictional discovery has taken place it still is necessary under

a theory of conspiracy jurisdiction that plaintiffs demonstrate jurisdiction by a preponderance of

the evidence.  See Second Amendment Foundation v. United States Conference of Mayors, 274

F.3d at 524; First Chicago Int'l v. United Exch. Co., 836 F.2d at 1377-78 ("bare allegation of

conspiracy or agency is insufficient to establish personal jurisdiction"); In re Vitamins Antitrust

Litigation, 2001 U.S. Dist. LEXIS 25073, at *46 (in conspiracy jurisdiction context, issue remains

"whether [plaintiffs] have satisfied their preponderance of the evidence burden necessary to defeat

the pending motion to dismiss for lack of personal jurisdiction").  Since jurisdictional discovery is

limited, however, plaintiffs must prove by a preponderance of the evidence only that acts in

furtherance of the alleged conspiracy took place in the District of Columbia.  Plaintiffs do not

have to demonstrate the very existence of the conspiracy by a preponderance of the evidence.  See

Second Amendment Foundation v. United States Conference of Mayors, 274 F.3d at 524 ("The

general rule . . . that a plaintiff must make a *prima facie* showing of the pertinent jurisdictional

facts applies to conspiracy-based jurisdiction.") (internal quotation omitted).  To impose this

additional requirement would place on plaintiffs the inequitable burden of demonstrating the

_____

    [13]    To the extent that plaintiffs assert that personal jurisdiction exists over the
individual moving defendants under a conspiracy jurisdiction theory under Section 12 of the
Clayton Act, this Court explicitly rejected the "conspiracy" theory in the Clayton Act context in
Mylan Laboratories, Inc. v. Akzo, N.V., 1990 U.S. Dist. LEXIS 3521, at *6 (jurisdiction "must
be properly established as to each defendant, and cannot be based upon allegations that the
defendant's co-conspirators were found there, or transacted business there, or that all the
conspirators are agents for each other").  See also Caribe Trailer Systems, Inc. v. Puerto Rico
Maritime Shipping Authority, 475 F. Supp. at 717.

existence of something by a preponderance of the evidence about which they have not yet had the opportunity to conduct discovery.

The Court concludes that if the activities alleged constitute a conspiracy to restrain trade, plaintiffs have demonstrated by a preponderance of the evidence that acts in furtherance of the conspiracy took place in the District of Columbia. Specifically, it is uncontested that defendant NRMP conducts the Match in the District of Columbia and that defendant AAMC facilitates the COTH Survey from the District. Plaintiffs also have submitted documentation demonstrating that the District-based institutional defendants MedStar-Georgetown Hospital Medical Center, George Washington University and MedStar Health, Inc. contracted in the District of Columbia with the NRMP to participate in the Match and employed resident physicians in the District of Columbia through the Match Program during the relevant period. See Pls.' (b)(2) Opp., Ex. 2, NRMP Directory 1999 Match, Hospitals and Programs Participating in the Matching Program at 12-13. Thus, if there was a conspiracy plaintiffs have demonstrated that several of the conspirators committed overt acts in furtherance of the conspiracy in the District of Columbia. See In re Vitamins Antitrust Litigation, 2001 U.S. Dist. LEXIS 25073, at *46. The question remains whether plaintiffs adequately have alleged that a conspiracy existed.

As the Court explains in Section IV(B), *infra*, plaintiffs adequately have alleged a conspiracy to depress resident compensation between, *inter alia*, those institutional defendants that participated in the Match and the NRMP. The Court therefore concludes that the fifteen moving institutional defendants who themselves acknowledge that they took part in the Match Program are subject to the jurisdiction of this Court under the conspiracy theory of jurisdiction. Those institutional defendants are Barnes Jewish-Hospital, Baylor College of Medicine, Beth

Israel Deaconess Medical Center, Inc., Boston Medical Center Corp., Cedars-Sinai Medical

Center, The Cleveland Clinic Foundation, Emory University, Rhode Island Hospital, Rush-

Presbyterian-St. Luke's Medical Center, St. Louis University, Stanford Hospital & Clinics,

Thomas Jefferson University Hospital, Inc., Administrators of the Tulane Educational Fund,

University Hospitals of Cleveland, Inc. and Yale-New Haven Hospital, Inc.[14]  Because plaintiffs

failed to demonstrate that defendant Washington University Medical Center participated in the

Match or otherwise participated in the conspiracy, plaintiffs have not demonstrated that the Court

has personal jurisdiction over Washington University Medical Center.  The Court therefore will

deny the motions to dismiss for lack of personal jurisdiction filed by fifteen of the sixteen moving

institutional defendants -- the exception being the motion of Washington University Medical

Center, which the Court will grant.

        With respect to the ABMS and the CMSS, the organizational defendants that

moved to dismiss for lack of personal jurisdiction, the Court concludes that because plaintiffs

have failed to demonstrate that either organization participated in the conspiracy, see Section

IV(B)(2), *infra*, the Court lacks personal jurisdiction over these organizational defendants under a

conspiracy theory of jurisdiction and will grant their motions to dismiss for lack of personal

jurisdiction.

---

[14]        Thirteen institutional defendants did not move to dismiss this action for lack of personal jurisdiction: Medstar-Georgetown Hospital Medical Center, Inc., George Washington University, MedStar Health, Inc., Beth Israel Medical Center, Duke University Health System, Inc., Henry Ford Health System, The Massachusetts General Hospital, The McGraw Medical Center of Northwestern University, The Mount Sinai School of Medicine of the City University of New York, The New York and Presbyterian Hospital, Strong Memorial Hospital of the University of Rochester, William Beaumont Hospital and Yeshiva University.

III.  DEFENDANT NRMP'S RULE 12(b)(1) MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION
AND MOTION TO COMPEL ARBITRATION

A.  *Background*

The NRMP moves to dismiss plaintiffs' claim against it for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that to the extent that plaintiffs' claim relates to the NRMP and its governing sponsors, the claim is subject to compulsory arbitration.  The NRMP therefore seeks an order "compelling plaintiffs to arbitrate the first element of their tripartite claim; namely, that defendants used the Matching Program to eliminate competition in the recruitment and employment of resident physicians."  Memorandum of Law in Support of Defendant National Resident Matching Program's Motion to Dismiss and to Compel Arbitration ("NRMP Arbit. Mem.") at 7 (internal quotation omitted).  The NRMP relies on the arbitration provision of Student Match Contract.  The provision states as follows:

> All claims, disputes and other matters in question *arising out of or relating to* this Agreement or the breach thereof, shall be decided by binding arbitration in accordance with the Rules of the American Arbitration Association then in effect, unless the parties mutually agree otherwise.  This agreement to arbitrate shall be specifically enforceable.  The NRMP Polices shall govern the demand for arbitration and other procedural matters.  The arbitrators shall conduct all arbitration proceedings in the Offices of the American Arbitration Association in Chicago, Illinois.  This Agreement shall be governed by the laws of the State of Illinois, but Illinois conflicts of laws provisions shall not be construed to apply the law of any other jurisdiction.  The unenforceability of one or more of the terms of this Agreement shall not affect the validity of the remaining terms.

Id., citing Beran Compel Aff., Ex. A-1, 1998 Student Agreement of Plaintiff Denise Greene

(emphasis added).[15]

The NRMP also relies on another provision in the Student Match Contract that

states that "[t]he NRMP Policies and Handbook are incorporated by reference in and are an

integral part of this agreement."  Beran Compel Aff., Ex. A-1, 1998 Student Agreement of

Plaintiff Denise Greene.  Among the policies of the NRMP Policies and Handbook is Paragraph

11.0, entitled "Disputes and Claims," which provides that "[a]ny controversy or claim arising out

of or related to the Matching Program, any NRMP Agreement or the breach thereof, and in

general all disputes between the NRMP and any applicant or institution participating or seeking

participation in the Matching Program shall be settled by arbitration in accordance with the Rules

of the American Arbitration Association then in effect . . . ."  Beran Compel Aff., Ex. A-5,

Policies of the NRMP, in effect March 1998 ¶11.0.

The NRMP further argues that the claim against the AMA also should be referred

to binding arbitration despite the fact that this organization is not a signatory to the Student

Match Contract, because plaintiffs' claim against it is based on the organizations' alleged status

---

[15]     Dr. Beran avers that the remaining named plaintiffs also entered into Student
Match Contracts with identical arbitration and choice of law provisions, and this assertion is not
disputed.  See Beran Compel Aff. ¶ 10.

as governing sponsors of the NRMP.  See NRMP Arbit. Mem. at 14-16.[16]  Plaintiffs and certain

institutional defendants oppose the motion.

> B.  *Compulsory Arbitration Under the Federal Arbitration Act*

The Federal Arbitration Act ("FAA") provides that a "written provision in . . . a

contract evidencing a transaction involving commerce to settle by arbitration a controversy

thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and

enforceable, save upon any grounds as exist at law or in equity for the revocation of any

contract."  9 U.S.C. § 2.  The FAA applies to any transaction involving interstate commerce and

creates a strong presumption in favor of the enforcement of agreements to arbitrate; any doubts

regarding the scope of an agreement to arbitrate are to be resolved in favor of arbitration.  See

Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226-27 (1987) (with enactment of

the FAA Congress mandated that arbitration agreements be rigorously enforced); see also Moses

H. Cone Memorial Hospital v. Mercury Construction Corporation, 460 U.S. 1, 24-25 (1983);

Finegold, Alexander & Assocs. v. Setty & Assocs., 81 F.3d 206, 207-08 (D.C. Cir. 1996).  The

Supreme Court has stressed that "the liberal federal policy favoring arbitration agreements,

manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the

---

[16]    The AMA conditionally moves to compel arbitration and adopts the arguments
put forth by the NRMP.  See Motion of Defendant American Medical Association to Dismiss the
Complaints Against It for Failure to State a Claim and Conditional Motion to Compel Arbitration
at 4-5.  Both the ABMS and the CMSS also conditionally move to compel arbitration.  See
Motion of American Board of Medical Specialties to Dismiss the Complaint ("ABMS Mot.") at
1; Motion of Council of Medical Specialty Societies to Dismiss the Complaint ("CMSS Mot.") at
1.  Because the Court has concluded that it lacks personal jurisdiction over these organizational
defendants, see Sections II(B)(1)(b), (2), *supra*, however, the Court will decline to consider the
motions to compel of the ABMS or the CMSS.

enforcement of private contractual arrangements." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985). Under the FAA, "[t]here is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" AT&T Technologies, Inc. v. Communication Workers of America, 475 U.S. 643, 650 (1986) (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960) (Brennan, J., concurring)).

This strong public policy in favor of arbitration must be considered in the context of the equally important principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." AT&T Technologies, Inc. v. Communication Workers of America, 475 U.S. at 648 (internal quotation and citation omitted). See also EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002) (FAA "does not require parties to arbitrate when they have not agreed to do so") (internal quotation and citation omitted); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995) ("[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties."). As the court of appeals has noted, "this principle recognizes that 'arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.'" National Railroad Passenger Corp. v. Boston & Maine Corp., 850 F.2d 756, 759 (D.C. Cir. 1988) (quoting AT&T Technologies, Inc. v. Communication Workers of America, 475 U.S. at 648).

In <u>Mitsubishi</u>, the Supreme Court provided the standard by which motions to compel arbitration should be evaluated. The Court's first task "is to determine whether the parties agreed to arbitrate [the] dispute," keeping in the forefront the strong policy favoring arbitration. <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. at 626. If the Court finds that the parties did agree to arbitrate the dispute at issue, the Court then must determine "whether legal constraints external to the parties' agreement foreclose[] the arbitration of those claims." <u>Id</u>. at 628. In other words, is there a competing statute or policy that outweighs the strong interest in referral to arbitration?

Relying on the plain language of arbitration provision of the Student Match Contract signed by each plaintiff -- all claims "arising out of or relating to this Agreement" shall be referred to binding arbitration -- the NRMP argues that plaintiffs' Section 1 conspiracy claim "arises out of" or "relates to" the Student Match Contract and therefore must be referred to arbitration. The NRMP maintains that the Match itself is "squarely challenged by plaintiffs in this action," that plaintiffs' complaint specifically alleges that "defendants eliminated competition 'by assigning prospective resident physician employees to resident positions through [the Match Program],'" and that the Match Program "is a mechanism that eliminates a free and competitive market and substitutes a centralized anticompetitive allocation system." NRMP Arbit. Mem. at 10-11 (quoting Compl. ¶¶ 3(b), 15, 83-85). The NRMP also focuses on the complaint's allegations that the Match Program "'imposes anticompetitive restraints through several of its features,'" including, *inter alia*, "'forcing applicants to commit contractually to any assigned position as a condition of enrolling in the matching program' and 'severely restricting attempts by employers and applicants to withdraw from the matching program.'" NRMP Arbit.

Mem. at 11 (quoting Compl. ¶ 86(a)-(b)). The NRMP asserts that the former of these features

"derives from paragraph 7.0 of the NRMP Policies to which applicants pledge adherence in the

[Student Match Contract], while the latter derives from Paragraph 9.0 thereof." Id. at 11. In light

of plaintiffs' specific allegations, the NRMP argues, the conspiracy claim with respect to the

NRMP clearly "relates to" or "arises out of" the Match Contract, and therefore should be referred

to arbitration under the arbitration agreement.

Plaintiffs respond that the arbitration agreement does not include antitrust claims

expressly, that their Sherman Act claim does not concern the Student Match Contract, and that

although this contract "may have evidentiary significance in proving defendants' illegal

conspiracy," such significance does not mean that the dispute itself "relates to" or "arises from"

the contract. Plaintiffs' Consolidated Brief Opposing Defendants' Motion to Dismiss and to

Compel Arbitration ("Pls.' Arbit. Opp.") at 8.

Generally, courts have interpreted broadly agreements providing for the

arbitration of disputes "arising out of or relating to" the underlying contract. See Mitsubishi

Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 624 n.13 ("arising out of or relating

to" is a "broad clause" applicable to antitrust claims); Prima Paint Corp. v. Flood & Conklin

Mfg. Co., 388 U.S. 395, 398 (1967) ("arising out of or relating to" is a "broad" arbitration

clause); Genesco v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 855 (2d Cir. 1987) (language

"sufficiently broad" to encompass fraudulent inducement claim). In order to determine whether

the arbitration agreement in the Student Match Contract encompasses plaintiffs' claim as it

relates to the NRMP, the Court must "focus on the factual allegations in the complaint rather

than the legal causes of action asserted." Genesco Inc. v. T. Kakiuchi & Co., 815 F.2d at 846.

"If the allegations underlying the claims 'touch matters' covered by the parties' . . . agreement, then those claims must be arbitrated . . . ." Id. (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 624 n.13).

Upon review of the complaint, the Court concludes that plaintiffs' conspiracy claim does relate in part to the Student Match Contract. Although plaintiffs assert that the agreement merely serves as evidence of the conspiracy, the allegations of the complaint suggest much more. Plaintiffs expressly allege that forcing plaintiffs to execute the contract was itself an anticompetitive act. See Compl. ¶ 86(b) (Match Program "imposes anticompetitive restraints through several of its features including . . . forcing applicants to commit contractually to any assigned position as a condition of enrolling in the matching program"); ¶ 100(b) ("Defendants and members of the Defendant Class illegally restrain competition in a number of related ways, including . . . assigning prospective resident physician employees to positions through the NRMP.").[17] Where the execution of the contract is itself alleged to be an anticompetitive act, plaintiffs cannot argue that the claim does not arise from or relate to the agreement. See Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 722 (9th Cir. 1999) (antitrust claim "arose in connection with" the contract where plaintiff alleged use of the agreement as an anticompetitive tool and court had to interpret agreement to determine whether competition was suppressed); PPG Industries, Inc. v. Pilkington plc, 825 F. Supp. 1465, 1478 (D. Ariz. 1993) (same).

_____

[17]    For these purposes, any distinction between allegations concerning the Match Program and the Student Match Contract is artificial. See Compl. ¶ 15 ("The NRMP exists for the sole purpose of illegally restraining trade by eliminating competition in the recruitment and employment of resident physicians by assigning prospective resident physician employees to medical residency positions.").

The cases on which plaintiffs rely in support of their position that the Student Match Contract merely evidences the alleged conspiracy do not lead to a different conclusion. In those actions, plaintiffs' claims were separate from and tangential to the contracts containing the arbitration provisions. See Telecom Italia, SPA v. Wholesale Telecom Corp., 248 F.3d 1109, 1116 (11th Cir. 2001) (no referral of claim of tortious interference with contract between plaintiff and third party on basis of arbitration provision in separate lease agreement between plaintiff and defendant in absence of charge that defendant used execution of lease agreement to interfere with third-party contract); AlliedSignal, Inc. v. B.F. Goodrich Co., 183 F.3d 568, 573 (7th Cir. 1999) (antitrust claim asserting, inter alia, anticompetitive pricing not referable under arbitration agreement because underlying contract did not regulate pricing); Ford v. NYLCare Health Plans of the Gulf Coast, Inc., 141 F.3d 243, 251 (5th Cir. 1998) (no arbitration of false advertising claim that could be maintained without reference to "legally irrelevant" service contract containing arbitration provision); Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1516 (10th Cir. 1995) (antitrust claims concerning defendant foreign brewer's alliance with rival domestic brewer unrelated to plaintiff's licensing agreement with foreign brewer and therefore not referable); Swenson's Ice Cream Co. v. Corsair Corp., 942 F.2d 1307, 1310 (8th Cir. 1991) (no referral of antitrust claim charging defendant undermined distribution agreement and not the separate franchise agreement containing relevant arbitration clause). Here, the Student Match Contract, its terms and its execution are part of plaintiffs' conspiracy claim and therefore relate to the agreement.

C.   *Countervailing Statutory or Policy Concerns*

In light of the Court's conclusion that plaintiffs' claim relates to the Student

Match Contract, the Court must determine whether a countervailing statute or policy renders the

claim nonetheless non-arbitrable.  While plaintiffs acknowledge that antitrust claims are

arbitrable as a matter of law, see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473

U.S. at 629; Kotam Electronics, Inc. v. JBL Consumer Products, Inc., 93 F.3d 724, 728 (11th Cir.

1996); Armco Steel Co., L.P. v. CSX Corp., 790 F. Supp. 311, 317 (D.D.C. 1991), they assert

that five countervailing policies direct the Court to deny the NRMP's motion to compel: (1) the

arbitration provision improperly results from the "overwhelming economic power" of

defendants; (2) NRMP policy requires that the parties share the costs of arbitration equally,

which improperly restricts plaintiffs from pursuing their statutory claims; (3) the arbitration

clause is unconscionable under Illinois law; (4) the arbitration clause is the result of duress under

Illinois law; and (5) under Illinois law the Student Match Contract and its arbitration provision

are unenforceable because they allegedly result from a violation of the antitrust laws.  See Pls.'

Arbit. Opp. at 18-28.  Certain institutional defendants also filed a brief in opposition to the

motion to compel, asserting that as a matter of Illinois law, a court and not an arbitrator must

decide whether a contract is void as a violation of the antitrust laws.  See Memorandum of Points

and Authorities in Support of Opposition by Various Defendants to Motion to Compel

Arbitration ("Inst. Defs.' Arbit. Mem.") at 1-2.

1.    Federal Defense of "Overwhelming Economic Power"

Plaintiffs first assert that they were forced to enter the Student Match Contract and, by extension, the arbitration provision, by the "overwhelming economic power" defendants hold over "[f]ourth year medical students, like plaintiffs here, [who] have no practical choice but to sign the match application -- with the 'boilerplate' arbitration clause on which NRMP relies which is presented to the medical students on a 'take it or leave it' basis." Pls.' Arbit. Opp. at 20-21. Plaintiffs argue that this imbalance in power between the NRMP and plaintiffs unlawfully denies them the right to vindicate their statutory rights under the Sherman Act. Plaintiffs rely on the Supreme Court's cautionary note in Mitsubishi that "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 627 (quoting 9 U.S.C. § 2). The Supreme Court subsequently has noted, however, that "[m]ere inequality in bargaining power [] is not a sufficient reason to hold that arbitration agreements are never enforceable . . . ." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991). See also Cole v. Burns Int'l Security Service, Civil No. 95-1785, 1996 U.S. Dist. LEXIS 22541, at *10-11 (D.D.C. Jan. 31, 1996), aff'd, 105 F.3d 1465 (D.C. Cir. 1997). In any event, the burden is on plaintiffs to demonstrate that this defense is "well-supported," Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 627, and they have failed to do so.

2.    The NRMP "Fee-Splitting" Policy

Plaintiffs next argue that NRMP Policy 11.0, which is incorporated by reference in the Student Match Contract, frustrates the objectives of the Sherman Act because it requires plaintiffs to share equally in the costs of arbitration.  See Pls.' Arbit. Opp. at 21.  The Policy states that "[e]ach party shall share equally in the costs of arbitration."  See Beran Compel. Aff., Ex. A-4, NRMP Policies in Effect for 1996 and 1997 Matches at 4.

Plaintiffs' "fee-splitting" claim does not survive scrutiny.  While plaintiffs provide an affidavit detailing the possible costs of arbitration in this matter (see Pls.' Arbit. Opp., Affidavit of Michael L. Shakman), they offer no support for their assertion that the individual plaintiffs are unable to meet the anticipated costs.  As the Supreme Court held in Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 92 (2000), "where a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  See also Livingston v. Associates Finance, Inc., 339 F.3d 553, 557 (7th Cir. 2003) (plaintiffs' failure to provide details of financial resources under Green Tree defeats plaintiffs' claim).[18]

Furthermore, the NRMP has stated that if any plaintiff "can show the fees are unreasonable given their respective financial situations, the NRMP has offered to pay the individual claimant's share of the costs of the arbitrator's fees."  Defendant National Resident

---

[18]    Although the opinion of the D.C. Circuit in Cole v. Burns International Security Services, 105 F.3d at 1486, may be read to announce a *per se* rule prohibiting arbitration where a plaintiff is forced to pay arbitration costs in excess of the costs of litigation pursuant to the arbitration agreement, this decision does not relieve a plaintiff from the burden of demonstrating his or her inability to pay under Green Tree.  See LaPrade v. Kidder, Peabody & Co., Inc., 246 F.3d 702, 708 (D.C. Cir. 2001).

Matching Program's Reply Brief on its Motion to Dismiss and to Compel Arbitration ("NRMP's Arbit. Reply") at 15. See also Tr. at 65 ("[E]ven if there were a burden there, it can be cured, and the NRMP has made the very offer that has been approved in other cases to waive that provision."). Where a party moving to compel arbitration offers to cover the costs of arbitration to the extent the opposing party demonstrates its inability to pay, the opposing party is foreclosed from arguing against arbitration on expense grounds. See Livingston v. Associates Finance, Inc., 339 F.3d at 557. As Judge Walton concluded in Nelson v. Insignia/ESG, Inc., 215 F. Supp. 2d 143, 157 (D.D.C. 2002), "even if the plaintiff had adequately demonstrated a *prima facie* showing of prohibitive expenses, the Court would conclude that the defendant's offer to pay all fees and expenses of arbitration effectively obviated any concerns the plaintiff may have raised regarding her ability to vindicate her claims in an arbitral forum because of the fee-splitting provision in the arbitration agreement." Accord Nur v. K.F.C., USA, Inc., 142 F. Supp. 2d 48, 52 (D.D.C. 2001) (same). The Court thus concludes that the arbitration provision of the Student Match Contract cannot be voided on the basis of NRMP Policy 11.0.

### 3.    Unconscionability

Section 2 of the FAA provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has concluded that "the text of § 2 declares that state law may be applied *'if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' Thus,

generally applicable contract defenses, such as fraud, duress, or unconscionability, may be

applied to invalidate arbitration agreements without contravening § 2." Doctor's Associates, Inc.

v. Casarotto, 517 U.S. 681, 686-87 (1996) (quoting Perry v. Thomas, 482 U.S. 483, 493 n.9

(1987)) (emphasis in original).

    Plaintiffs assert that the arbitration provision in the Student Match Contract

should not be enforced because it is unconscionable under Illinois law.[19]  Specifically, they argue

that a gross disparity in bargaining positions existed between the NRMP and the medical

students, that plaintiffs had no meaningful choice when presented with the Student Match

Contract, and that the terms of the arbitration provision, "especially the fee-splitting

requirement," are unreasonably favorable to defendants.  Pls.' Arbit. Opp. at 26.  The Supreme

Court of Illinois has held that "a contract is unconscionable when it is improvident, oppressive,

or totally one-sided . . . ."  The Streams Sports Club, Ltd. v. Richmond, 457 N.E.2d 1226, 1232

(Ill. 1983) (internal citations omitted).  Applying this standard, Illinois courts have found

unconscionable those contracts that encompass "a lack of meaningful choice by one party," and

that an unconscionable bargain is one "which no reasonable person would make, and no honest

person would accept."  Saunders v. Michigan Avenue National Bank, 662 N.E.2d 602, 610

(Ill. App. Div. 1996) (internal citation omitted).  "Factors relevant to finding a contract

unconscionable include gross disparity in the values exchanged or gross inequality in the

---

[19]   It is undisputed that Illinois law applies to plaintiffs' contract-based claims
pursuant to the choice of law provision in the Student Match Contract.  See Beran Compel. Aff.,
Ex. A-1, 1998 Student Agreement of Plaintiff Denise Greene ("This agreement shall be governed
by laws of the State of Illinois, but the Illinois conflicts of law provision shall be not be construed
to apply the law of any other jurisdiction.").

bargaining positions of the parties together with terms unreasonably favorable to the stronger party."  Ahern v. Knecht, 563 N.E.2d 787, 792 (Ill. App. Div. 1999).

The Court concludes that the arbitration provision of the Student Match Contract is not unconscionable under Illinois law.  Plaintiffs make broad assertions that the agreement is "unreasonably favorable" to defendants and that plaintiffs had no meaningful choice when presented with the agreement.  Under Illinois law, however, "mere disparity of bargaining power is not sufficient grounds to vitiate contractual obligations."  The Streams Sports Club, Ltd. v. Richmond, 457 N.E.2d at 1232.  Furthermore, "Illinois law does not void contracts where parties have unequal bargaining power, even if a contract is a so-called 'take-it-or-leave-it' deal and 'consent to [the] agreement is secured because of hard bargaining positions or the pressure of financial circumstances.'"  Koveleskie v. SBC Capital Markets, Inc., 167 F.3d 361, 367 (7th Cir. 1999) (quoting Kewanee Prod. Credit Ass'n v. G. Larson & Sons Farms, 496 N.E.2d 531, 534 (Ill. App. Div. 1986)).  "'Rather, the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order have an agreement invalidated. . . . [T]he mere fact that a person enters into a contract as a result of the pressure of business circumstances . . . is not sufficient.'"  Koveleskie v. SBC Capital Markets, Inc., 167 F.3d at 367 (quoting Kewanee Prod. Credit Ass'n v. G. Larson & Sons Farms, 496 N.E.2d at 534).  This is the case even if the contract is perceived to be a mandatory gateway to participation in a specific profession.  See Metro East Center for Conditioning and Health, 294 F.3d 924, 926 (7th Cir. 2002).[20]

---

[20]    To the extent that plaintiffs substantially rest their unconscionability argument on the claim that the fee-splitting provision makes the arbitration agreement "oppressive" and "totally one-sided,"  Pls.' Arbit. Opp. at 26, the argument is rejected for the reasons stated in

4.    Duress

Plaintiffs also argue that the arbitration agreement is unenforceable because it is a product of economic duress.  Under Illinois law,

> [d]uress occurs where one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the exercise of one's own free will.  To establish duress, one must demonstrate that the threat has left the individual bereft of the quality of mind essential to the making of a contract.  The acts or threats complained of must be wrongful; however, the term "wrongful" is not limited to acts that are criminal, tortious, or in violation of a contractual duty.  They must extend to acts that are also wrongful in a moral sense.

Krilich v. American National Bank and Trust Co. of Chicago, 778 N.E.2d 1153, 1162 (Ill. App. Div. 2002) (internal citation and quotation omitted).  See also Hurd v. Wildman, Harrold, Allen and Dixon, 707 N.E.2d 609, 614 (Ill. App. Div. 1999).

Plaintiffs do not argue that they were actually threatened or forced to enter the Student Match Contract but suggest that they lacked "free will" in that they either could sign the contract or "surrender their plan to become physicians and forfeit the time and money that they had invested in medical school."  Pls.' Arbit. Opp. at 27.  Once again, however, under Illinois law "where consent to an agreement is secured merely because of hard bargaining positions or financial pressures, duress does not exist."  Hurd v. Wildman, Harrold, Allen and Dixon, 707 N.E.2d at 614.  In addition, plaintiffs' argument that the NRMP's conduct was "wrongful" in executing the Student Match Contract because the contract allegedly formed part of the antitrust conspiracy is irrelevant to the duress analysis.  The "wrongful" act for these purposes must relate

---

Section III(C)(2), *supra*, in view of the NRMP's offer to pay the individual plaintiffs' shares of the costs of arbitration.

to any intentional pressure or threats applied by the contracting party to enter into the agreement, not to the alleged "wrongfulness" of the underlying contract. See id. at 615 ("Unless wrongful or unlawful pressure is applied, there is no business compulsion or economic duress."). The Court therefore concludes that the arbitration provision is not voidable as a product of duress.

5.    Avoidance of Arbitration Under Illinois Arbitration Law

Finally, plaintiffs assert that in analyzing the motion to compel, the Court should apply Illinois arbitration law pursuant to the general choice of law provision of the Student Match Contract, and that under Illinois law the Student Match Contract is not enforceable because the contract itself allegedly "results from defendants' violation of the antitrust laws." Pls.' Arbit. Opp. at 24. Certain of the institutional defendants make a somewhat similar argument, asserting that under Illinois law, a court -- and not an arbitrator -- must decide whether the Student Match Contract violates the antitrust laws. See Inst. Defs.' Arbit. Mem. at 1-2. Defendants respond that both arguments are foreclosed by the Supreme Court's decision in Mastrobuono v. Shearson Lehman Hutton, Inc., in which the Court held that the parties' intent to incorporate state laws or rules regarding the scope of arbitration must be clear, and that a broad choice of law clause is insufficient to meet that requirement. See NRMP's Arbit. Reply at 20-21. Defendants assert that Illinois arbitration law therefore is not applicable here because the parties' intent to apply the state's arbitration law is not clearly demonstrated.

Plaintiffs and the institutional defendants primarily rely on Armco Steel Co. v. CSX Corp., 790 F. Supp. at 319, in which Judge Hogan concluded that "the FAA does not compel parties to arbitrate when the parties have chosen to be governed by state law and the state

-50-

law relieves the parties of the responsibility to arbitrate when there is an allegation that the

contract itself is a product of a violation of the antitrust laws."  Judge Hogan concluded that by

including a general choice-of-law provision in the underlying contract, the parties "indicated their

intention to arbitrate to the extent allowed by Ohio law."  Id.

 Four years after Judge Hogan decided Armco, however, the Supreme Court

decided Mastrobuono.  The dispute in Mastrobuono arose out of a standard form contract that

expressly provided in a general choice of law clause that the contract was to be governed by the

laws of the State of New York.  The matter went to arbitration, and the arbitrators awarded

punitive damages.  Respondent moved for vacatur of the arbitration award on the ground that

under New York law only courts may award punitive damages, a law that conflicted with the

FAA rule allowing arbitrators to do so.  See Mastrobuono v. Shearson Lehman Hutton, Inc., 514

U.S. at 53.  The district court granted respondent's motion, concluding that the general choice of

law provision directed application of New York arbitration law to the arbitration matters.  The

Seventh Circuit upheld the decision to vacate the award, and appellants sought and obtained

certiorari.

 The Supreme Court first determined that nothing in the contract indicated that the

parties affirmatively expressed their intent to preclude the arbitrator from awarding punitive

damages notwithstanding the general choice of law provision.  See Mastrobuono v. Shearson

Lehman Hutton, Inc., 514 U.S. at 62.  The Court found that at most the general choice of law

provision actually introduced an ambiguity into a contract that otherwise would have allowed for

punitive damage awards, and in light of the strong federal policy favoring arbitration, any

ambiguity had to be read in favor of arbitration and thus against application of New York law.

See id.; see also EEOC v. Waffle House, Inc., 534 U.S. at 293 n.9 (noting that Mastrobuono held

that clear contractual language governs interpretation of arbitration agreements, but where choice

of law provision is ambiguous the agreement must be read to favor arbitration under FAA).

More specifically, the Court in Mastrobuono held that "the choice of law provision covers the

rights and duties of the parties, while the arbitration clause covers arbitration" and its scope.

Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. at 64.

    Numerous courts of appeals have concluded that Mastrobuono requires that the

intent of the contracting parties to apply state arbitration rules or law to arbitration proceedings

must be explicitly stated in the contract and that under Mastrobuono, a general choice of law

provision does not evidence such intent.  See Sovak v. Chugai Pharmaceutical Co., 280 F.3d

1266, 1270 (9th Cir. 2002) ("[A] general choice-of-law clause within an arbitration provision

does not trump the presumption that the FAA supplies the rules for arbitration."); Roadway

Package System, Inc. v. Kayser, 257 F.3d 287, 288-89 (3d Cir. 2001) ("[A] generic choice-of-law

clause, standing alone, is insufficient to support a finding that contracting parties intended to opt

out of the FAA's default standards."); UHC Management Co., Inc. v. Computer Sciences Corp.,

148 F.3d 992, 997 (8th Cir. 1998) (finding general choice of law provision insufficient; court

"will not interpret an arbitration agreement as precluding the application of the FAA unless the

parties' intent that the agreement be so construed is abundantly clear"); Ferro Corp. v. Garrison

Industries, Inc., 142 F.3d 926, 936 (6th Cir. 1998) (rejecting general choice of law provision in

absence of "indication that the parties intended to incorporate Ohio law to determine that the

issue of fraudulent inducement should be adjudicated in a judicial forum"); Porter Hayden Co. v.

Century Indem. Co., 136 F.3d 380, 383 (4th Cir. 1998) ("[T]he choice-of-law provision in the

[agreement] is neither an unequivocal expression of the parties' intent to commit adjudication of

timeliness defenses to the court, rather than to an arbitrator, nor, more generally, an unequivocal

expression of the parties' intent to invoke Maryland, rather than federal, arbitration law.");

National Union Fire Insurance Co. of Pittsburgh, Pa. v. Belco Petroleum Corp., 88 F.3d 129, 135

(2d Cir. 1996) ("[T]he choice-of-law clause is not an unequivocal inclusion of a New York rule

that requires the preclusive effect of a prior arbitration to be decided by the court.");

PaineWebber Inc. v. Elahi, 87 F.3d 589, 594 (1st Cir. 1996) (general choice of law provision did

not indicate parties' intent to apply state rule requiring a judicial determination of effect of

relevant clause).

   In light of Mastrobuono and its progeny, the Court concludes that plaintiffs and

the institutional defendants cannot rely on Judge Hogan's decision in Armco in support of their

assertion that the general choice of law provision in the Student Match Contract suffices to

demonstrate the parties' intent to apply Illinois law to define the scope of the arbitrator's

authority.  Mastrobuono requires more.  See Mastrobuono v. Shearson Lehman Hutton, Inc., 514

U.S. at 62; see also Ferro Corp. v. Garrison Industries, Inc., 142 F.3d at 933 (district court's

reliance on Armco in support of application of state arbitration law on basis of general choice of

law provision was "misplaced . . . because [court] was bound to follow the Supreme Court's

more recent decision [in Mastrobuono]").[21]

---

[21]   Although the NRMP drafted the Match Contract, the Court concludes that the
policy directing a court to hold ambiguity against the drafter does not outweigh the policies that
heavily favor arbitration.  See Volt Information Sciences, Inc. v. Board of Trustees,  489 U.S.
468, 479 (1989).

This Circuit's decision in Ekstrom v. Value Health, Inc., 68 F.3d 1391 (D.C. Cir. 1995), is not to the contrary. In Ekstrom, the court of appeals considered the dismissal of the appellants' petition to vacate an arbitration award as untimely on the ground that Connecticut law restricted the time period within which a party could appeal an arbitration award to 30 days, a shorter period than allowed for under the FAA. The parties agreed that Connecticut substantive law on contracts and on arbitration applied, but appellants asserted that the statute of limitations question was procedural in nature under Connecticut law. See id. at 1394. The court of appeals concluded, however, that the statute of limitations issue was a substantive question under Connecticut law and therefore that Connecticut state arbitration laws applied. See id. at 1395. The court also concluded that the state law was not preempted by the FAA because no direct conflict existed in light of the parties' agreement to apply Connecticut substantive law. See id. at 1395-96. This Court concludes that Ekstrom is not inconsistent with Mastrobuono. Mastrobuono does not prevent parties from deciding that a state's arbitration law applies; it only requires that such a choice is expressed unequivocally, and the parties in Ekstrom expressly agreed that Connecticut substantive arbitration law applied. Here, by contrast, no such agreement exists. This Court therefore concludes that in this case federal arbitration law under the FAA defines the scope of the arbitrator's authority.[22]

The Court's conclusion is significant because federal law differs in substantial ways from Illinois law (as it is described by the non-moving parties) to the detriment of the non-

---

[22]    To the extent that other members of this Court have interpreted Ekstrom post-Mastrobuono to extend a general choice of law provision to matters concerning the scope of the arbitrator's authority, the undersigned respectfully disagrees. See Int'l Technologies Integration, Inc. v. The Palestinian Liberation Organization, 66 F. Supp. 2d 3, 9 n.5 (D.D.C. 1999).

moving parties' efforts to avoid arbitration. Plaintiffs assert that under Illinois law a party is

relieved from an arbitration agreement if the underlying contract is alleged to be void for

violation of the antitrust laws. Under the FAA, however, a party is not relieved from an

agreement to arbitrate on the ground that the contract is allegedly void for violation of the

antitrust laws unless plaintiffs demonstrate that the Court's enforcement of the arbitration

provision would make the Court a party to the unlawful activity. See Dickstein v. duPont, 443

F.2d 783, 786 (1st Cir. 1971) (antitrust defenses to arbitration "allowed only in cases where the

intrinsic illegality of the contract is so clear that enforcement would make a court party to the

precise conduct forbidden by the law"); In re Universal Service Fund Telephone Billing Practices

Litigation, No. 02-MD-1468, 2003 U.S. Dist. LEXIS 9235, at *9-11 (D. Kan. May 27, 2003)

(finding arbitration clause enforceable, concluding that "a contract that is legal on its face and

does not call for unlawful conduct in its performance is not voidable or unenforceable simply

because it resulted from an antitrust conspiracy"). See also Kelly v. Kosuga, 358 U.S. 516, 518

(1959) ("[A] plea of illegality based on violation of the Sherman Act has not met with much

favor in this Court."); National Souvenir Center, Inc. v. Historic Figures, Inc., 728 F.2d 503, 514-

16 (D.C. Cir. 1984) ("remote danger" that court would be a party to enforcing illegal restraint

"outweighed by the probability that allowing the [antitrust] defense would let the buyer escape

from its side of a bargain"). Plaintiffs have made no such showing. Similarly, while the

institutional defendants assert that Illinois law requires a court to determine whether a contract

violates the antitrust laws, federal law permits the arbitrator to make that determination. See

Simula, Inc. v. Autoliv, Inc., 175 F.3d at 721-22 (antitrust claim involving contract that allegedly

functioned to restrain trade properly referred to arbitration); Coors Brewing Co. v. Molson

Breweries, 51 F.3d at 1516 (same).[23]

D.  *Compelling Countervailing Interest in the Proper Adjudication of Sherman Act Claims*

While the Court has concluded that the arbitration clause in the Student Match

Contract encompasses the claim the NRMP seeks to have arbitrated, and that none of the

countervailing statutory or policy considerations suggested by plaintiffs and certain institutional

defendants relieve them from the responsibility to arbitrate, the Court nonetheless concludes that

compelling arbitration of any part of the conspiracy claim would undermine the purposes of the

Sherman Act by improperly compartmentalizing plaintiffs' single conspiracy claim.  The Court

also concludes that the request for arbitration by the AMA, a non-signatory to the Student Match

Contract, would result in further improvident compartmentalizing of the claim.

In its motion, the NRMP describes plaintiffs' conspiracy claim, designating three

main elements: the use of the Match Program to eliminate competition in the recruitment and

employment of medical residents, the exchange of competitively sensitive information regarding

resident physician compensation and benefits, and the promulgation of and compliance with

purportedly anticompetitive accreditation standards.  See NRMP's Arbit. Mem. at 3-4.  The

NRMP asserts that "[t]ogether, these three elements of the supposed conspiracy are said to have

'the purpose and effect of artificially fixing, depressing, standardizing and stabilizing resident

physician compensation and other terms of employment.'"  Id. at 4 (quoting Compl. ¶ 101).

---

[23]    Having determined that Mastrobuono precludes application of Illinois law relating
to the scope of an arbitrator's authority, the Court does not reach the question of whether the
parties accurately represented the status of Illinois law.

Plaintiffs likely would not dispute this characterization of their claim.  The NRMP then seeks an

order "compelling plaintiffs to arbitrate the first element of their tripartite claim; namely, that

defendants used the Matching Program to eliminate competition in the recruitment and

employment of resident physicians.'"  NRMP's Arbit. Mem. at 7.  Characterizing plaintiffs'

single conspiracy claim as "tripartite," however, cannot disguise the fact that plaintiffs' claim

alleges a single conspiracy with three interacting prongs that -- when considered together -- are

alleged to have the anticompetitive effect charged.

 The Supreme Court has held that where certain claims within a multi-count

complaint are arbitrable, the liberal federal policy favoring arbitration directs referral of those

claims to arbitration "even where the result would be the possibly inefficient maintenance of

separate proceedings in different forums."  Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 217

(1985).  See also NPS Communications, Inc. v. The Continental Group, Inc., 760 F.2d 463, 465

(2d Cir. 1995) (retaining non-arbitrable antitrust claims while referring arbitrable contract claims

to arbitration).  In Dean Witter, the Supreme Court rejected the "doctrine of intertwining claims"

as a defense to arbitration even when "piecemeal" litigation results, "at least absent a

countervailing policy manifested in another federal statute."  Id. at 221.  Some courts also have

concluded that "the Arbitration Act requires the separation of arbitrable 'issues' from non-

arbitrable ones" within individual claims.  Rain v. The Donning Co./Publishers, Inc., 964 F.2d

1455, 1460 (4th Cir. 1992) (in single breach of contract claim alleging multiple bases for breach,

referring to arbitration only those bases expressly arbitrable under relevant agreement).

 It does not follow, however, that one element of an overarching conspiracy claim,

an element in which multiple defendants allegedly are involved, should be referred to arbitration.

-57-

Conspiracy is a far different creature from breach of contract, and conspiracy allegations in antitrust cases cannot be compartmentalized and considered in isolation "as if they were separate lawsuits, thereby overlooking the conspiracy claim itself."  In re Fine Paper Antitrust Litigation, 685 F.2d 810, 822 (3d Cir. 1982).  Indeed, in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962), the Supreme Court expressly held that in cases that involve an alleged conspiracy among multiple actors involving multiple acts,

> plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . . [I]n a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.

Id. at 699 (internal quotation and citation omitted).  See also In re Consumer Credit Counseling Services Antitrust Litigation, Misc. No. 97-0233/Civil Action No. 97-1741, 1997 U.S. Dist. LEXIS 19669, at *13-14 (D.D.C. Dec. 4, 1997) (refusing to consider allegations of various anticompetitive acts separately when brought under single conspiracy claim, concluding that "the character and effect of the conspiracy are not to be evaluated by viewing its separate parts. . . . [T]he ramification and effect of the conspiracy should be looked at as a whole."); In re Medical X-Ray Film Antitrust Litigation, 946 F. Supp. 209, 218 (E.D.N.Y. 1996) (refusing to consider elements of conspiracy claim separately because "while each of these factors taken in isolation does not necessarily provide a basis alone for inferring an agreement or conspiracy, in combination, these factors, taken together and 'on the ground,' may support a reasonable inference that an agreement or conspiracy existed").

-58-

Chief Judge Hogan's decision in In re Vitamins Antitrust Litigation, Misc. No. 99-0197, 2000 U.S. Dist. LEXIS 7397 (D.D.C. May 9, 2000) is instructive on this issue. In that case, certain defendants moved to sever the allegations that related to those defendants in plaintiffs' single price-fixing conspiracy claim, arguing that not one but three conspiracies existed, each based on different vitamins produced. Relying on Continental Ore, Judge Hogan denied the motion to sever portions of the single conspiracy claim, concluding that "it would be improper . . . to prejudge the scope of the conspiracy that plaintiffs allege," and noting that "the trier of fact 'must look at the whole picture and not merely at the individual figures in it.'" Id. at *75 (quoting Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. at 699). The Court finds the Continental Ore directive even more compelling in the instant action, in which defendants assert that the alleged anticompetitive acts are facially lawful if considered separately. See Section IV(B)(3)-(5) *infra*. The Court concludes that the Continental Ore decision and its progeny manifest a clear and compelling countervailing interest in the comprehensive adjudication of conspiracy claims brought under the Sherman Act. Defendant NRMP's motion to compel arbitration therefore must be denied.

The Court also concludes that the request for arbitration made by the AMA, a non-signatory to the Student Match Contract, must be denied as well. The referral of the claim would further improperly compartmentalize plaintiffs' single conspiracy claim. Moreover, inasmuch as this request is predicated on a theory of derivative liability resulting from the AMA's role as a "governing sponsor" of the NRMP, the Court's conclusion that the claim as it relates to the NRMP is non-arbitrable also defeats these additional requests. See NRMP Arbit. Reply at 30-31. It also seems self-evident that entities that are not parties to a contract containing

an arbitration agreement are not entitled to arbitrate their disputes.  As the Supreme Court said in

Waffle House, "[t]he FAA directs courts to place arbitration agreements on equal footing with

other contracts, but it 'does not require parties to arbitrate when they have not agreed to do so.'"

EEOC v. Waffle House, Inc., 534 U.S. at 293 (quoting Volt Information Sciences, Inc. v. Board

of Trustees, 489 U.S. at 478).  None of the plaintiffs in this case has a contractual obligation to

arbitrate any claims with the AMA and the Court will not require them to do so.  See Dayhoff,

Inc. v. H.J. Heinz, Inc., 86 F.3d 1287, 1296-97 (3d Cir. 1996).

### IV.   DEFENDANTS' RULE 12(b)(6) MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiffs raise one claim of price-fixing against all defendants under Section 1 of

the Sherman Act: "Defendants and others have illegally contracted, combined and conspired

among themselves to displace competition in the recruitment, hiring, employment and

compensation of resident physicians, and to impose a scheme of restraints[,] which have the

purpose and effect of fixing, artificially depressing, standardizing and stabilizing resident

physician compensation and other terms of employment."  Compl. ¶ 2.  Certain defendants have

filed motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure.

### A.   *The Legal Framework*

#### 1.   Failure to State a Claim in the Antitrust Context

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court

must assume the truth of the facts alleged in the complaint and may grant the motion only if it

appears that plaintiffs will be unable to prove any set of facts that would justify relief.  See

Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325 (1991); Browning v. Clinton, 292 F.3d 235,

242 (D.C. Cir. 2002); Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  The

complaint must contain "either direct or inferential allegations respecting all material elements

necessary to sustain a recovery under some viable legal theory." In re Vitamins Antitrust

Litigation, 2000 U.S. Dist. LEXIS 7397, at *45.  The complaint "is construed liberally in the

plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be

derived from the facts alleged." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276

(D.C. Cir. 1994).  Accord Andrx Pharmaceuticals v. Biovail Corp. Int'l, 256 F.3d 799, 805 (D.C.

Cir. 2001) (same standard in antitrust context).  The Court need not accept any inferences drawn

by plaintiffs, however, "if such inferences are unsupported by the facts set out in the complaint.

Nor must the Court accept legal conclusions cast in the form of factual allegations." Andrx

Pharmaceuticals v. Biovail Corp. Int'l, 256 F.3d at 805 (quoting Kowal v. MCI Communications

Corp., 16 F.3d at 1276).

       To survive a Rule 12(b)(6) motion in the antitrust context, plaintiffs must do more

than simply paraphrase the language of the federal antitrust laws or state in conclusory terms that

a defendant has violated those laws.  See Dial A Car, Inc. v. Transportation, Inc., 884 F. Supp.

584, 588 (D.D.C. 1995), aff'd 82 F.3d 484 (D.C. Cir. 1996).  "If [a plaintiff] claims an antitrust

violation, but the facts he narrates do not at least outline or adumbrate such a violation, he will

get nowhere merely by dressing them up in the language of antitrust." Sutliff, Inc. v. Donovan

Companies, Inc., 727 F.2d 648, 654 (7th Cir. 1984).  See also TV Communications Network, Inc.

v. Turner Network Television, Inc., 964 F.2d 1022, 1024 (10th Cir. 1992).  "Conclusory

allegations, in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a

fishing expedition." DM Research, Inc. v. College of American Pathologists, 170 F.3d 53, 55

(1st Cir. 1999). See also GTE New Media Services Inc. v. Ameritech Corp., 21 F. Supp. 2d at

40. The Supreme Court has cautioned, however, that in the antitrust context, "where 'the proof is

largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample

opportunity for discovery should be granted very sparingly." Hospital Building Co. v. Trustees

of Rex Hospital, 425 U.S. 738, 746 (1976) (quoting Poller v. Columbia Broadcasting, 368 U.S.

464, 473 (1962)).

2.    Conspiracy in Restraint of Trade under Section 1

In order to state a claim of conspiracy in restraint of trade in violation of Section 1

of the Sherman Act, plaintiffs must allege (1) that the defendants entered into some agreement,

contract, combination, conspiracy or other concerted activity; (2) that at least one defendant

committed an overt act in furtherance of the conspiracy; and (3) that the agreement constituted an

unreasonable restraint of trade in the relevant market in a manner that had an impact on interstate

commerce. See Invamed, Inc. v. Barr Laboratories, Inc., 22 F. Supp. 2d 210, 221 (S.D.N.Y.

1998); Dial A Car, Inc. v. Transportation, Inc., 884 F. Supp. at 591. Like other conspiracies, at

the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to

join it. While an agreement in "restraint on trade is rarely evidenced by an express oral or written

agreement," Binder v. District of Columbia, Civil Action No. 90-0255, 1991 U.S. Dist. LEXIS

7094, at *9 (D.D.C. May 22, 1991), plaintiffs must allege "that the challenged restraint is not the

result of independent actions by the defendants," but rather that "the defendants consciously

committed to a common agreement of an unreasonable restraint on trade." <u>GTE New Media Services Inc. v. Ameritech Corp.</u>, 21 F. Supp. 2d at 42 (citing <u>Monsanto v. Spray-Rite Service Corp.</u>, 465 U.S. 752, 761 (1984)).  In the Section 1 context, "'[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement.'" <u>Federal Trade Commission v. Mylan Laboratories, Inc.</u>, 62 F. Supp. 2d 25, 55 (D.D.C. 1999) (quoting <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983)).  Courts therefore "have . . . allowed 'inferences [to be] fairly drawn from the behavior of the alleged conspirators' to prove conspiracy." <u>See</u> <u>Binder v. District of Columbia</u>, 1991 U.S. Dist. LEXIS 7094, at *9 (quoting <u>Michelman v. Clark-Schwebel Fiber Glass Corp.</u>, 534 F.2d 1036, 1043 (2d Cir. 1991)).

### 3.    Inapplicability of <u>Matsushita</u> to Rule 12(b)(6) Motions

Two defendants, the ACGME and Yeshiva University ("Yeshiva"), argue that there is another element to the legal standard that plaintiffs must satisfy in order to survive a motion to dismiss in the antitrust context.  Specifically, these defendants assert that there is a limitation on the inferences that the Court may make in consideration of their motions to dismiss that derives from the Supreme Court's decision in <u>Matsushita Electric Industrial Co. v. Zenith Radio Co.</u>, 475 U.S. 574 (1986).  In <u>Matsushita</u>, the Supreme Court considered a Section 1 conspiracy claim in the summary judgment context, and concluded that if a plaintiff relies on circumstantial evidence of an agreement rather than express acts, and if the claim against a defendant appears implausible, a plaintiff has an additional evidentiary burden:

> [T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e).  Lack of motive bears on the range of permissible conclusions that might be drawn from

> ambiguous evidence: if petitioners had no rational economic
> motive to conspire, and if their conduct is consistent with other,
> equally plausible explanations, the conduct does not give rise to an
> inference of conspiracy.

Id. at 596-97.  Thus, if it appears that a defendant lacks a plausible motive for engaging in

anticompetitive conduct, in order to survive summary judgment a plaintiff must present evidence

that "show[s] that the inference of conspiracy is reasonable in light of the competing inferences

of independent action or collusive action that could not have harmed respondents."  Id. at 587.

The ACGME and Yeshiva ask the Court to extend Matsushita to plaintiffs' initial pleading

burden, thereby requiring plaintiffs to have put forth allegations in their complaint demonstrating

the reasonableness of their conspiracy claim in comparison with potential competing inferences

defendants may raise.  See Memorandum of Defendant Accreditation Council for Graduate

Medical Education in Support of Its Motion to Dismiss ("ACGME (b)(6) Mem.") at 16;

Defendant Yeshiva University's Memorandum in Support of Its Motion to Dismiss ("Yesh.

(b)(6) Mem.") at 7-8.

       The Court concludes that application of the Matsushita rule simply is not

appropriate in the context of a motion to dismiss.  A motion to dismiss for failure to state a claim

generally is made before discovery and should be evaluated on the basis of the four corners of the

pleading.  See Summit Health, Ltd. v. Pinhas, 500 U.S. at 325; Browning v. Clinton, 292 F.3d at

242.  A summary judgment motion commonly is filed after at least some discovery and it turns

on whether there is a genuine issue of material fact for trial; it is only in that post-discovery

context in which the plausibility of competing motives should be assessed.  See Eastman Kodak

Co. v. Image Technical Services, Inc., 504 U.S. 451, 468 (1992) ("Matsushita demands only that

the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was

not invented, but merely articulated, in that decision.  If the plaintiff's theory is economically

senseless, no reasonable jury could find in its favor, and summary judgment should be granted.").

By contrast, plaintiffs are not required to set forth allegations of motive in their

complaint in anticipation of what defendants may argue on a motion to dismiss are equally

plausible explanations for the alleged conspiratorial activities.  See Atlantic Coast Airlines

Holdings, Inc. v. Mesa Air Group, Inc., Civil Action No. 03-2198, 2003 U.S. Dist. LEXIS 22792,

at *41-42 (D.D.C. Dec. 18, 2003) (rejecting applicability of Matsushita evidentiary burden on

motion for preliminary injunction); In re Compact Disc Minimum Advertised Price Antitrust

Litigation, 138 F. Supp. 2d 25, 27 (D. Me. 2001) (expressly rejecting application of Matsushita

summary judgment evidentiary burden to conspiracy claim on motion to dismiss); AD/SAT v.

Associated Press, 885 F. Supp. 511, 521 (S.D.N.Y. 1995) (plaintiff's conspiracy allegations

"while sufficient to survive a motion to dismiss, [were] inadequate to defeat the . . . motion for

summary judgment [under the Matsushita standard]").  Antitrust claims, like all other claims, are

subject only to the notice pleading requirements of Rule 8 of the Federal Rules of Civil

Procedure.  See Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) ("[A] short plain

statement of a claim for relief which gives notice to the opposing party is all that is necessary in

antitrust cases, as in other cases under the Federal Rules."); MCM Partners, Inc. v. Andrews-

Bartlett & Associates, 62 F.3d 967, 976 (7th Cir. 1995) ("[A]n antitrust plaintiff need not include

the particulars of his claim to survive a motion to dismiss. . . . It is instead sufficient for the

-65-

plaintiff to include in its complaint only a short and plain statement of the claim showing an

entitlement to relief.") (internal quotation and citation omitted).[24]

### 4.    The Import of Continental Ore and American Tobacco

In Continental Ore Co. v. Union Carbide & Carbon Corp., the Supreme Court

held that in cases that involve an alleged conspiracy among multiple actors involving multiple

acts,

> plaintiffs should be given the full benefit of their proof without
> tightly compartmentalizing the various factual components and
> wiping the slate clean after scrutiny of each.  The character and
> effect of a conspiracy are not to be judged by dismembering it and
> viewing its separate parts, but only by looking at it as a whole . . .
> and in a case like the one before us, the duty of the jury was to look
> at the whole picture and not merely at the individual figures in it.

Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. at 699 (internal quotation and

citation omitted).  See also In re Fine Paper Antitrust Litigation, 685 F.2d at 822 (conspiracy

---

[24]    The cases relied upon by defendants in support of their argument for application
of Matsushita in the dismissal context do not convince the Court otherwise.  In those decisions,
the courts extended the plausibility analysis articulated in Matsushita to one of impossibility,
effectively concluding that those plaintiffs' complaints failed to state a claim under Rule
12(b)(6).  See DM Research, Inc. v. College of American Pathologists, 170 F.3d at 56 ("[A]n
implausible conclusory assertion may turn out to be true . . . [b]ut the discovery process is not
available where, at the complaint stage, a plaintiff has nothing more than unlikely
speculations."); TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d
at 1026-27 ("Because [defendants] would have no rational motive to create such an environment,
[plaintiff's] allegations do not provide an inference of specific intent to conspire to achieve the
stated goal of the conspiracy [to monopolize pursuant to Section 2 of the Sherman Act]"); United
Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F. Supp. 2d 385, 402 (S.D.N.Y.
2001) ("Since, under any theory, plaintiffs [sic] alleged conspiracy to engage in predatory pricing
is entirely unnecessary and makes no economic sense, plaintiffs fail to state a claim under section
1.").  See also Dial A Car, Inc. v. Transportation, Inc., 82 F.3d at 487 (While motions to dismiss
should be granted sparingly, dismissal is appropriate where appellant "not only fails to allege any
facts supporting its claim . . . , it also offers nothing to indicate that monopolization of the
relevant market is even possible, let alone probable").

-66-

allegations in antitrust cases can not be compartmentalized and considered seriatim "as if they were separate lawsuits, thereby overlooking the conspiracy claim itself"); <u>In re Medical X-Ray Film Antitrust Litigation</u>, 946 F. Supp. at 218 (same).  Although <u>Continental Ore</u> was decided in the context of a motion for a directed verdict after trial, its maxim has been applied in a variety of contexts, including in consideration of motions to dismiss.  <u>See In re Consumer Credit Counseling Services Antitrust Litigation</u>, 1997 U.S. Dist. LEXIS 19669, at *13-14 (court cannot consider alleged anticompetitive acts separately on a motion to dismiss when those acts are alleged to be part of a single conspiracy claim); <u>In re Medical X-Ray Film Antitrust Litigation</u>, 946 F. Supp. at 218 (summary judgment); <u>ITT World Communications Inc. v. Western Union Telegraph Co.</u>, 524 F. Supp. 702, 704 (S.D.N.Y. 1981) (denying motion to dismiss).  "[T]he character and effect of the conspiracy are not to be evaluated by viewing its separate parts . . . . [T]he ramification and effect of the conspiracy should be looked at as a whole."  <u>In re Consumer Credit Counseling Services Antitrust Litigation</u>, 1997 U.S. Dist. LEXIS 19669, at *13-14.  In analyzing defendants' Rule 12(b)(6) motions, the Court therefore will consider the allegations with respect to the individual defendants only in the context of the larger conspiracy alleged.

The Supreme Court also stated in <u>Continental Ore</u> that "acts which are in and of themselves legal lose that character when they become constituent elements of an unlawful scheme."  <u>Continental Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. at 707.  As the Court earlier had announced in <u>American Tobacco Co. v. United States</u>, 328 U.S. 781 (1946):

> It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns.  It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful.  Acts done to give effect to the conspiracy may be in themselves wholly innocent acts.

> Yet, if they are part of the sum of the acts which are relied upon to
> effectuate the conspiracy which the statute forbids, they come
> within its prohibition.

Id. at 809.  See also In re Medical X-Ray Film Antitrust Litigation, 946 F. Supp. at 218;

ITT World Communications Inc. v. Western Union Telegraph Co., 524 F. Supp. at 704.

Neither of these rules, however, relieves plaintiffs of the burden of adequately

alleging that a conspiracy to restrain trade existed in the first instance and that each defendant

knowingly joined or agreed to participate in the conspiracy.  If plaintiffs fail to do so, neither

Continental Ore nor American Tobacco shield plaintiffs' claims from dismissal.  See Southern

Pacific Communications Co. v. American Telephone & Telegraph Co., 556 F. Supp. 825, 888

(D.D.C. 1983) ("[N]othing in Continental Ore requires a conclusion that a defendant that has not

engaged in an unlawful conspiracy, and has committed no acts in themselves violative of the

Sherman Act, could be found guilty of antitrust violations on some theory that the acts have

'synergistic effects' that convert lawful conduct into violations of law.") (emphasis in original).

B.    *Organizational Defendants' Motions to Dismiss*

Plaintiffs have sued seven organizational defendants: (1) the American Hospital

Association ("AHA"); (2) the American Board of Medical Specialties ("ABMS"); (3) the

Council of Medical Specialty Societies ("CMSS"); (4) the American Association of Medical

Colleges ("AAMC"); (5) the American Medical Association ("AMA"); (6) the Accreditation

Council for Graduate Medical Education ("ACGME"); and (7) the National Resident Matching

Program ("NRMP").  Plaintiffs in their complaint allege that the AAMC "operates and manages"

the Match Program, which functions to suppress competition in the hiring of medical residents by

adopting policies that "restrict[] attempts by employers and applicants to withdraw from the matching program," that "prohibit[] employment agreements between [Match Program] participants outside the [M]atch," and that require "applicants to commit contractually to any assigned position as a condition of enrolling in the [Match Program]." Compl. ¶ 86(a), (b). Certain ACGME standards that limit the number of residents in any given program and limit the mobility of medical residents between programs allegedly further serve to suppress competition in the hiring and employment of medical residents. See id. ¶ 88. Plaintiffs charge that medical students are compelled to participate in the Match Program because "with few exceptions, only resident physicians who complete specified employment periods in ACGME-accredited institutions and programs or combined programs are eligible for ABMS-member board certification," and that the ACGME "encourages and/or requires participation in [the Match] as a condition of accreditation." Id. ¶¶ 87, 88(c).

    Plaintiffs' claim is that the restrictive "one position" nature of the Match Program combined with the ACGME accreditation standards together foreclose any external pressure on the institutional defendants to raise compensation levels that would be generated by prospective medical residents with multiple employment offers and their attendant bargaining power. See Compl. ¶ 92. This allegedly allows for compensation to be stabilized at a depressed level, facilitated by the institutional defendants' receipt of the COTH Survey distributed by the AAMC and the FREIDA database maintained by the AMA, which both provide annual medical resident compensation information. See id. ¶ 80. Furthermore, the AAMC's and the AMA's dissemination of recent and current compensation information and the ACGME's review of individual residency programs' compensation policies allegedly provide the means by which the

institutional co-conspirators' compensation levels are policed.  See id. ¶¶ 73, 88(d).  Plaintiffs

allege that medical resident salaries are and essentially have been stabilized at artificially low

rates for more than 30 years, notwithstanding differences between programs in program prestige,

geographic location, resident merit and year of employment.  See id. ¶¶ 92-96.

From these allegations, the Court concludes that plaintiffs adequately have alleged

a common agreement to displace competition in the recruitment, hiring, employment and

compensation of resident physicians and to impose a scheme of restraints, which have the

purpose and effect of fixing, artificially depressing, standardizing and stabilizing resident

physician compensation and other terms of employment among a number of the named

organizational defendants and those institutional defendants that participated in the Match

Program.  The extent to which plaintiffs adequately have alleged that the organizational

defendants participated in the conspiracy and which organizational defendants participated is the

subject of the following analyses.[25]

All the organizational defendants but the NRMP have filed motions to dismiss for

failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  All of the

movants except the ACGME assert that plaintiffs' claim based on the allegation that they are

"governing sponsors" of the NRMP and the ACGME cannot survive scrutiny.  The AAMC and

the AMA also argue that their information exchange programs -- in the case of the AAMC, the

---

[25]     Only one institutional defendant, Yeshiva University, separately moved to dismiss
the complaint for failure to state a claim.  Its arguments are addressed in Section IV(C), *infra*.
Four other institutional defendants joined the motions to dismiss filed by the AAMC, the AMA
and the ACGME.  None of the joining institutional defendants, however, are similarly situated to
the organizations such that dismissal of the organizational defendants would provide a basis for
dismissal of the institutions, as is evident in the following pages.

COTH Survey; in the case of the AMA, the FREIDA database -- cannot form the basis of a Section 1 antitrust claim. The ACGME argues that its creation and enforcement of accreditation standards for resident medical programs is non-commercial conduct that is beyond the reach of the antitrust laws.

1.    Motion to Dismiss of the AHA

The AHA moves to dismiss the claim against it on the ground that the only allegations in the complaint pertaining to it -- namely that it is a "governing sponsor" of the NRMP and the ACGME – are insufficient to demonstrate its participation in an antitrust conspiracy. The AHA further argues that those generalized allegations in the complaint pertaining to all "defendants" are conclusory and also are insufficient to tie the association to the conspiracy. See Memorandum of American Hospital Association in Support of Its Motion to Dismiss for Failure to State a Claim ("AHA (b)(6) Mem.") at 1-2.[26]

Plaintiffs concede that they do not make any argument on the basis of the vicarious liability of the so-called governing sponsors for the actions of the NRMP or the ACGME or on the basis of any like doctrine. See Plaintiffs' Consolidated Brief in Opposition to Defendants' Rule 12(b)(6) Motions ("Pls.' (b)(6) Opp.") at 46. Instead, they assert that they have made specific allegations of direct participation by the AHA in the conspiracy. Yet plaintiffs

---

[26]    Defendants AMA, AAMC, ABMS and CMSS moved to join AHA's motion to dismiss to the extent that plaintiffs' allegations pertain to them in their capacity as governing sponsors of the NRMP and the ACGME. See Memorandum of Defendant American Medical Association in Support of Its Motion to Dismiss the Complaint Against It for Failure to State a Claim Based on Maintenance of the FREIDA Database ("AMA (b)(6) Mem") at 5; Memorandum of Law in Support of Defendant American Association of Medical Colleges' Motion to Dismiss for Failure to State a Claim ("AAMC (b)(6) Mem.") at 21; ABMS Mot. at 2; CMSS Mot. at 2.

offer only the following paragraphs of the complaint to tie the AHA to the alleged conspiracy: that the AHA is a "governing sponsor" of the NRMP and the ACGME (see Compl. ¶ 19); that "[d]efendants collectively design and implement [the Match Program] and collectively agree to and comply with its anticompetitive restrictions" (see id. ¶ 83); that "[d]efendants periodically refine the [Match Program] to strengthen and expand its anticompetitive effect and to close avenues of circumvention" (see id. ¶ 85); and that the Match Program "adopt[s] policies forcing the vast majority of prospective resident physicians to use the [Match Program] rather than attempting to find employment on their own" (Id. ¶ 86(a)).  See Pls.' (b)(6) Opp. at 43-44 (quoting complaint).

Plaintiffs do not dispute the AHA's assertion that Illinois law, the state of incorporation of the AHA and the NRMP, does not recognize or otherwise define the term "governing sponsor."  The meaning of the term "governing sponsor" is far from self-evident, and plaintiffs do not make any assertions with respect to what role governing sponsors play for either the NRMP or the ACGME.  The Court will not speculate as to the purpose or activities of a "governing sponsor" or infer from this vague term that the AHA "designed and implemented" or "facilitated" the Match Program or that, through its "active governance" of the ACGME, the AHA "created" the allegedly anticompetitive accreditation standards.  Pls.' (b)(6) Opp. at 44, 44 n.31, 45.  While all inferences are to be drawn in favor of plaintiffs on a motion to dismiss, the Court will not draw inferences from such vague, unsupported allegations.  See Andrx Pharmaceuticals v. Biovail Corp. Int'l, 256 F.3d at 805.  Nor will the Court permit plaintiffs to supplement the bare and insufficient allegations in their complaint with additional assertions from their brief.  It is "axiomatic that the complaint may not be amended by the briefs in

-72-

opposition to a motion to dismiss." <u>Car Carriers, Inc. v. Ford Motor Corp.</u>, 745 F.2d 1101, 1107
(7th Cir. 1984); <u>see</u> <u>Coleman v. Pension Benefit Guaranty Corp.</u>, 94 F. Supp. 2d 18, 24 n.8
(D.D.C. 2000).

        Furthermore, plaintiffs' use of the term "defendants" to refer to multiple
defendants situated very differently from one another in the context of general and global
allegations is insufficient either by itself or in combination with the allegations relating to
"governing sponsor" to demonstrate a basis for the AHA's participation in the conspiracy.
Plaintiffs cannot escape their burden of alleging that each defendant participated in or agreed to
join the conspiracy by using the term "defendants" to apply to numerous parties without any
specific allegations as to the AHA.  <u>See</u> <u>Invamed, Inc. v. Barr Laboratories, Inc.</u>, 22 F. Supp. 2d
at 221 ("The complaint fails to support the existence of conspiracy as it presents no facts that
might establish any participation by [parent companies] save including them within the term
'defendants.' . . . [Plaintiff] has not alleged that the [parent companies] 'acted' in any way.").
Although the Court must consider defendants' motions to dismiss in the context of the larger
conspiracy, as discussed in Section IV(A)(4), <i>supra</i>, plaintiffs are not relieved from alleging that
each individual defendant joined the conspiracy and played some role in it.  <u>See</u> <u>Invamed, Inc. v.</u>
<u>Barr Laboratories, Inc.</u>, 22 F. Supp. 2d at 221; <u>Southern Pacific Communications Co. v.</u>
<u>American Telephone & Telegraph Co.</u>, 556 F. Supp. at 888.[27]

---

[27]    Plaintiffs' reference to the Court's decision in <u>In re Vitamins Antitrust Litigation</u>,
2000 U.S. Dist. LEXIS 7397, is misplaced.  In that case, Chief Judge Hogan concluded that a
plaintiff need not allege overt acts committed by each defendant in furtherance of a conspiracy.
<u>See</u> <u>id</u>. at *53.  He did not hold that plaintiffs need not plead that an individual defendant was a
participant in the conspiracy in the first instance.

Plaintiffs' allegations themselves evidence the ambiguity inherent in the global term "defendants." Surely paragraph 83 of the complaint, for example, does not mean that all the defendants design the Match Program or that each defendant is in a position to implement it. <u>See</u> Compl. ¶ 83 ("Defendants collectively design and implement [the Match Program] and collectively agree to and comply with its anticompetitive restrictions."). Nor can paragraph 85 mean that each defendant "periodically refine[s] the matching program to strengthen and expand its anticompetitive effect," for not every defendant is in a position to do so. <u>Id</u>. ¶ 85. <u>Compare</u> <u>In re Magnetic Audiotape Antitrust Litigation</u>, 99 Civ. 1580, 2002 U.S. Dist. LEXIS 8366, at *14 (S.D.N.Y. May 9, 2002) (allegations concerning all "defendants" adequate where allegation addressed specific meeting of all defendants at which price-fixing conspiracy was established).

The Court concludes that plaintiffs' allegations with respect to the AHA are vague, conclusory and simply insufficient to meet plaintiffs' burden under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court therefore grants defendant AHA's motion to dismiss for failure to state a claim.

### 2.    Motions to Dismiss of the CMSS and the ABMS

Defendants CMSS and ABMS move to dismiss the complaint by joining in the motions of the AMA, the AAMC, the ACGME and the AHA. <u>See</u> CMSS Mot. at 2; ABMS Mot. at 2. Upon review of the complaint, the Court determines that the only explicit or implied reference to the CMSS in the complaint is an allegation defining the CMSS as "an Illinois not-for-profit corporation whose membership consists of 17 physician societies in specialties having a member board participating in ABMS. The CMSS is one of five governing sponsors of the

NRMP and the ACGME."  Compl. ¶ 21.   Plaintiffs allege that the ABMS also is one of five

governing sponsors of the NRMP and the ACGME.  See id. ¶ 20.[28]  Plaintiffs further allege (1)

that the ABMS is "an Illinois not-for-profit corporation whose membership consists of 24

recognized medical specialty certification boards in the United States" (id.); (2) that these

medical specialty boards "develop and apply professional and education standards for the

evaluation and certification of physician specialists" (id.); and (3) that "[s]pecialty certification

by one of the ABMS-member boards is essential to graduating medical school seniors and other

eligible prospective residents.  ABMS-member boards, with few exceptions, accept only

ACGME-accredited residency employment in satisfaction of certification requirements."  Id.

¶ 69.

        Even if these allegations adequately alleged that the 17 physician societies that are

members of the CMSS or the 24 medical certification boards that are members of the ABMS

were part of the conspiracy, the Court will not impute the activities of either organization's

members to the organization itself absent allegations that the entity participated in the conspiracy.

There are no such allegations in the complaint, and it is established that a trade association or like

organization can be held liable "for concerted action" taken by its members in furtherance of a

conspiracy only if the association "acted as an entity."  Alvord-Polk, Inc. v. F. Schumacher &

Co., 37 F.3d 996, 1007 (3d Cir. 1994).  "[C]oncerted action does not exist every time a trade

association member acts or speaks," and an association cannot be held liable "for the actions of

its individual members alone."  Id.; compare Mastercard Int'l Inc. v. Dean Witter, 93 Civ. 1478,

---

[28]    The Court rejects plaintiffs' governing sponsor assertions with respect to the
CMSS and the ABMS as insufficient for the reasons stated in Section IV(B)(1), *supra*.

1993 U.S. Dist. LEXIS 11964, at *6-7 (S.D.N.Y. Aug. 27, 1993) (association comprised of

horizontal competitors acting as a single entity under name of association in order to restrain

trade subject to Section 1 scrutiny).  For these reasons, together with those stated in Section

IV(B)(1), *supra*, regarding governing sponsors, the Court concludes that plaintiffs have failed to

state a claim against either the CMSS or the ABMS.

### 3.     Motion to Dismiss of the AAMC

The AAMC asserts that only three allegations in the complaint pertain to it:

(1) the AAMC "manage[s] and operate[s] the residency matching program of the NRMP"

(Compl. ¶ 15); (2) the "AAMC is one of the five governing sponsors of both the NRMP and the

ACGME" (id. ¶ 17); and (3) "the AAMC/COTH annually surveys members of the COTH

Section" of the AAMC and then "publishes an annual report entitled 'Survey of Housestaff

Stipends, Benefits and Funding,'" which includes, *inter alia*, historical (from 1968) and current

national average salaries for first year residents as well as the average salaries for years one

through six of the post graduate years of employment (id. ¶ 74).  See AAMC (b)(6) Mem. at 3.

In addition to these specific allegations cited by the AAMC, plaintiffs include introductory

information about the AAMC, alleging that it is a not-for-profit corporation made up of a

membership including "all 125 accredited medical schools (including those medical schools

named as Defendants in this Complaint) and approximately 375 major teaching hospitals and

health systems in the United States (including those hospitals and health systems named as

Defendants in this Complaint)."  Compl. ¶ 17.[29]

---

[29]     The Court rejects plaintiffs' "governing sponsor" allegations as insufficient for the
reasons stated in Section IV(B)(1), *supra*, with respect to the AHA.  The Court also rejects the

With respect to the allegations concerning the COTH Survey, plaintiffs plead in detail the way in which the AAMC through the COTH Survey allegedly facilitates the conspiracy by annually gathering and disseminating medical resident compensation information.  See Compl. ¶¶ 73-79, 81.  Specifically, plaintiffs make the following allegations:  The AAMC annually surveys the members of the COTH Section in July seeking compensation levels for the employment year that begins that month.  See id. ¶ 74.  Approximately 75% of all residents are employed by COTH Section members that the AAMC surveys.  See id. ¶ 75.  Based on the responses, the AAMC publishes the COTH Survey, which in addition to compensation information includes budgetary information detailing resident compensation as a percentage of total operating budgets, the ratio of resident benefits to salaries, and funding sources for resident salaries.  See id. ¶ 77.  The full Survey is distributed in October or November of that same year with a "preliminary report" containing only salary information issued some time prior to the full report.  Id. ¶ 78.  The information disseminated in the Survey is highly specific because once salary information is broken down into subsets, those subsets "consist of as few as five employers."  Id. ¶ 76.  As a function of the foregoing, the "annual survey data provide employers with a baseline for determining resident physician compensation for the upcoming year.  The following year employers are provided with another survey report which establishes a new baseline.  In this way, employers avoid straying from standardized compensation levels."  Id. ¶ 79.

---

allegation that the AAMC "manages and operates" the NRMP as insufficient because plaintiffs offer no support for this conclusory allegation.

The AAMC argues that plaintiffs have failed to state a claim against it because the allegations related to the COTH Survey concern only the exchange of information that is only in aggregated form, because the Survey includes no information on future compensation, because the information is readily available to the public, and because there is no allegation that the AAMC participated in any discussion of compensation information.  See AAMC (b)(6) Mem. at 7-21.  The AAMC maintains that the dissemination of this kind of information under such circumstances is not a violation of the antitrust laws.[30]

As a preliminary matter, the Court notes that the AAMC mischaracterizes plaintiffs' claim by limiting the scope of the claim to the allegations that explicitly name the AAMC.  A more accurate characterization of plaintiffs' claim is that there exists an agreement to fix the compensation of resident physicians at an improperly depressed level and that the AAMC has participated in the conspiracy by facilitating the anticompetitive agreement through the creation and dissemination of the COTH Survey, which provides a mechanism by which compensation levels remain stabilized and depressed.  Plaintiffs specifically allege that together the Match Program and the ACGME accreditation standards eliminate the possibility that prospective medical residents can use compensation as a bargaining chip in gaining employment or in negotiating the terms of employment, and that the compensation information disseminated by the AAMC assists in keeping compensation levels for resident physicians fixed.  The

---

[30]    Four institutional defendants have joined the AAMC's Rule 12(b)(6) motion to dismiss.  See Defendant Beth Israel Medical Center's Notice of Joinder in Motions to Dismiss ("Beth Israel Joinder") at 1; Notice by Defendants Duke University Health System, Inc., and Mount Sinai School of Medicine of the City University of New York of Their Joinder in Motions to Dismiss ("Duke/Sinai Joinder") at 1; Defendant the New York and Presbyterian Hospital's Notice of Joinder in Motions to Dismiss ("NY/Presb. Joinder") at 1-2.

AAMC's motion to dismiss must be viewed through the lens of this larger price-fixing charge, and through this lens the Court concludes that while plaintiffs have not alleged expressly that the AAMC agreed to join the conspiracy, it is reasonable to infer from the facts and circumstances detailed in the complaint that the AAMC, an organization whose membership includes the institutional defendants, annually collects and disseminates compensation information to its members in order to facilitate the alleged compensation-fixing agreement and to allow for internal policing of member co-conspirators.

The AAMC argues that several facets of the COTH Survey preclude the Court from concluding that plaintiffs adequately have alleged that the AAMC participated in the conspiracy, but none of its arguments is persuasive.  First, the fact that plaintiffs' allegations regarding the AAMC concern information dissemination does not prevent the Court from concluding that the AAMC participated in the conspiracy.  While the sharing of pricing and other information often may serve legitimate purposes, United States v. United States Gypsum Co., 438 U.S. 422, 443 n.16 (1978), "information exchange is an example of a facilitating practice that [in some circumstances] can help support an inference of a price-fixing agreement."  Todd v. Exxon Corp., 275 F.3d at 198.  See also Penne v. Greater Minneapolis Area Board of Realtors, 604 F.2d 1143, 1148 (8th Cir. 1979) (exchange of price information among competitors, although not a *per se* violation, may carry with it "the potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions") (internal quotation omitted).  Second, the fact that the COTH Survey only offers aggregated information rather than employer-specific information does not mean that such information could not have been utilized to facilitate the price-fixing conspiracy.  See AAMC (b)(6) Mem. at 14-15.  To the

contrary, plaintiffs expressly have alleged that "once salary information [in the COTH Survey] is broken down into subsets based on year of employment, region and ownership type, those subsets consist of as few as five employers." See Compl. ¶ 76. In similar circumstances other courts have found sufficient allegations of antitrust violations. See Todd v. Exxon Corp., 275 F.3d at 212 (aggregated compensation data reducible to subsets consisting of three competitors facilitated price-fixing conspiracy).

Third, the fact that plaintiffs allege only the exchange of past and current price information -- as contrasted with proposals for future price increases or announcements of new prices -- does not defeat plaintiffs' claim that the information exchange facilitated the stabilization of medical resident compensation. As the Supreme Court has held, "[e]xchanges of current price information . . . have the greatest potential for generating anti-competitive effects and . . . have consistently been held to violate the Sherman Act." United States v. United States Gypsum Co., 438 U.S. at 443 n.16. From plaintiffs' allegations regarding the COTH Survey, it is reasonable to infer that the annual nature of the survey provides the institutional defendant co-conspirators the information they need to keep compensation levels depressed; each institutional defendant is able to set compensation levels consistent with the previous year knowing that the levels will be checked against those of the coming year with the next Survey. See United States v. Container Corp. of America, 393 U.S. 333, 335 (1969) (exchange of historical and current price information anticompetitive because it "seemed to have the effect of keeping prices within a fairly narrow ambit"); Todd v. Exxon Corp., 275 F.3d at 210.

Fourth, the fact that the information is publicly disseminated does not insulate the activity from consideration in the larger price-fixing claim. As the Ninth Circuit concluded in In

re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 906 F.2d 432

(9th Cir. 1990), "[t]he fact that it is feasible for the appellees to communicate the necessary price

information through press releases does not 'immunize the exchange of price information from

legal sanction [where] the conditions of the market suggest that the exchange promotes collusive

rather than competitive pricing.'" Id. at 447 (quoting RICHARD POSNER, ANTITRUST LAW: AN

ECONOMIC PERSPECTIVE 147 (Univ. Chi. Press 1976)).  Here, the alleged conditions of the

market suggest that the information exchange does not promote competitive compensation levels.

In an unrestrained market, prospective residents ostensibly could use the information in the

COTH Survey to better evaluate competing offers among institutional defendants and to conduct

more informed negotiations with the residency programs.  In the market as alleged in the

complaint, however, prospective residents cannot utilize the information in such a manner

because there are no competing offers; the Match requires prospective residents to commit to one

position before their receive any offer of employment.

Finally, plaintiffs do not allege only that the dissemination of the COTH Survey

allows the institutional defendants to set depressed compensation levels.  Plaintiffs also allege

that the COTH Survey provides a policing mechanism for the various institutions -- a separate,

second way in which plaintiffs charge that the AAMC's distribution of the COTH Survey

facilitates the price-fixing conspiracy.  See Compl. ¶ 73.  With the annual COTH Survey the

institutional defendants not only are able to gauge their own compensation levels on a regular

basis, but also are able to monitor their co-conspirators to ensure that others are not departing

upward from the depressed levels.  Plaintiffs' allegation that "survey reports have at times

included statistics on 'atypical' deviations from salary averages" underscores this point.  Id.

¶ 81(b); see Todd v. Exxon Corp., 275 F.3d at 212 ("Price exchanges that identify particular

parties, transactions, and prices are seen as potentially anticompetitive because they may be used

to police a secret or tacit conspiracy to stabilize prices.").  Upon careful consideration of the

AAMC's motion to dismiss for failure to state a claim, and granting all reasonable inferences in

favor of plaintiffs as it must at this juncture, the Court will deny the AAMC's motion to dismiss.

### 4.    Motion to Dismiss of the AMA

The AMA asserts that only two paragraphs in the complaint relate to it: (1) the

allegation that it is a "governing sponsor" of both the NRMP and the ACGME (see Compl. ¶ 18);

and (2) the allegation that "employers have access to resident physician compensation

information through an electronic database known as the Fellowship and Residency Electronic

Interactive Database ('FREIDA'), which is maintained by the AMA." Id. ¶ 80.[31]  According to

plaintiffs, "[t]he information contained in FREIDA is not average or aggregated data.  It is

detailed and employer-specific." Id.  The AMA argues that the FREIDA-based allegation fails to

state a claim against the AMA.  Like the AAMC, the AMA contends that plaintiffs have not

alleged that the association entered into an agreement with competitors to fix medical resident

compensation, but rather only that the AMA allegedly conspired to disseminate information.  See

AMA (b)(6) Mem at 5-6.[32]

---

[31]    Four institutional defendants have joined the AMA's Rule 12(b)(6) motion to
dismiss.  See Beth Israel Joinder at 1; Duke/Sinai Joinder at 1; NY/Presb. Joinder at 1-2.

[32]    The AMA further argues that if the Court infers that the AMA was a member of
the conspiracy through its maintenance of the FREIDA database, by analogy the publisher of the
American Lawyer's annual survey of salaries of first year law firm associates could not be
dismissed from an antitrust case brought by associates challenging their compensation.  See
Reply Memorandum in Support of Motion of Defendant American Medical Association to

For the reasons stated with respect to the AAMC's dissemination of compensation information in Section IV(B)(3), *supra*, the Court cannot conclude automatically that the AMA's dissemination of resident compensation information in the FREIDA database could not form the basis for an inference that the AMA participated in the alleged conspiracy.[33]  The Court does conclude, however, that by contrast to the AAMC, there is such a paucity of detail in plaintiffs' complaint concerning the AMA that plaintiffs' conclusory allegations do not survive a motion to dismiss for failure to state a claim.  Unlike the allegations related to the COTH Survey, plaintiffs fail to allege how the FREIDA database information is utilized and distributed in furtherance of the conspiracy; they allege only that resident physician compensation is available through the database.  Compare Compl. ¶ 80 (single allegation indicating existence of FREIDA database) with id. ¶¶ 74-79, 81 (detailed description of how COTH Survey functions to facilitate alleged conspiracy).  Furthermore, unlike the allegation concerning the AAMC's membership, the alleged membership of the AMA of individual "physicians and others in the health care field"

_____

Dismiss the Complaint Against It for Failure to State a Claim at 24.  The Court disagrees.  Unlike the medical profession, there is no institutional, national employment placement structure in place whereby law students interview with law firms, rank their preferences for employment and contractually commit to acceptance of a single position prior to receiving an offer into which the American Lawyer's information enters.  There also is no indication that law firm associates are underpaid.

[33]       In addition, whether the AMA's operation of the FREIDA database and the dissemination of database information is itself lawful is irrelevant.  See American Tobacco Co. v. United States, 328 U.S. at 809 ("[I]f [otherwise lawful acts] are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."); In re Medical X-Ray Film Antitrust Litigation, 946 F. Supp. at 218; ITT World Communications Inc. v. Western Union Telegraph Co., 524 F. Supp. at 704.  For this reason, the AMA's argument set forth in its supplemental memorandum that plaintiffs allegedly conceded that the FREIDA database is lawful does not inform the Court's analysis.  See Supplemental Memorandum of Defendant American Medical Association in Support of Its Motion to Dismiss the Complaint Against It for Failure to State a Claim at 2.

does not lend support to an inference that the AMA participated in the alleged conspiracy.  See id. ¶ 18.  The Court therefore grants the AMA's motion to dismiss.[34]

### 5.    Motion to Dismiss of the ACGME

The ACGME moves to dismiss plaintiffs' claim against it on the ground that the creation and enforcement of accreditation standards for resident medical programs is non-commercial conduct that is beyond the reach of the antitrust laws.  In addition, the ACGME argues that plaintiffs have failed to allege that the ACGME took part in any conduct outside of educational accreditation.  See ACGME (b)(6) Mem. at 2.[35]

Plaintiffs allege in their complaint that the ACGME accreditation standards play a central role in the conspiracy to depress medical resident salaries.  Broadly stated, plaintiffs allege that completion of an ACGME-accredited residency program is perceived by medical students as necessary to ultimate board certification and practice.  See Compl. ¶¶ 69, 87.  More specifically, plaintiffs allege that four elements of the accreditation process function to unlawfully restrain the commercial endeavor of employing resident physicians and to fix, depress and stabilize compensation and other terms of employment in several ways.  See id. ¶ 88.  Plaintiffs allege that the ACGME: (1) "has the authority to regulate the number of employment positions a particular program may offer, and exercises that authority;" (2) "imposes substantial obstacles to the ability of a resident physician to transfer from one employer to another during the

---

[34]    The Court rejects plaintiffs' governing sponsor allegations as insufficient for the reasons stated in Section IV(B)(2), *supra*.

[35]    Four institutional defendants have joined the ACGME's Rule 12(b)(6) motion to dismiss.  See Beth Israel Joinder at 1; Duke/Sinai Joinder at 1; NY/Presb. Joinder at 1-2.

period of residency, essentially making the NRMP assignment effective for the entire duration of the residency;" (3) "encourages and/or requires participation in the [Match Program by the institutional defendants] as a condition of accreditation;" and (4) "in reviewing compliance with accreditation standards" directly reviews compensation and other terms of employment "with the purpose and effect of fixing, depressing, standardizing and stabilizing such compensation and terms." Id. ¶¶ 88(a)-(d). In effect, plaintiffs allege that the ACGME aided in and enforced the conspiracy to depress the compensation of resident physicians by promulgating and enforcing accreditation standards (1) that directly aid in the suppression of competition in the employment and compensation of medical residents effectuated through the Match Program; and (2) that provide the ACGME the authority to review individual compensation levels for resident physicians in order to police compensation levels among its alleged co-conspirators.

The ACGME is correct that actors in the educational world and/or professional associations have been held to be insulated from the antitrust laws if the activity at issue is non-commercial in nature. See Marjorie Webster Junior College v. Middle States Association of Colleges and Secondary Schools, Inc., 432 F.2d 650, 654 (D.C. Cir. 1970) (absent commercial motive, process of accreditation presumptively is "distinct from the sphere of commerce; it goes rather to the heart of the concept of education itself"); Selman v. Harvard Medical School, 494 F. Supp. at 621 (medical school admissions "distinctly" non-commercial). It also is true, however, that in Goldfarb v. Virginia State Bar, 421 U.S. 773, 787 (1975), the Supreme Court expressly eliminated any blanket exception to the antitrust laws for professional educational entities, "learned professions," and professional associations, emphasizing that "Congress intended to strike as broadly as it could in § 1 of the Sherman Act." Id. Since Goldfarb, educational entities

often have been subjected to the antitrust laws if the activity at issue is determined to be commercial.  See National Collegiate Association of Athletics v. Board of Regents of the University of Oklahoma, 468 U.S. 85, 98 (1984) (educational association restriction on members' participation in television market commercial); Law v. National Collegiate Athletic Association, 134 F.3d 1010, 1019 (10th Cir. 1998) (college athletic association restriction on salary of coaching staff commercial in nature); United States v. Brown University, 5 F.3d 658, 667 (3d Cir. 1993) (inter-university agreement limiting financial aid programs sufficiently commercial to be subject to antitrust laws).[36]

The applicability of the antitrust laws to educational and/or accreditation organizations is a question of fact.  When such entities "perform acts that are the antithesis of commercial activity, they are immune from antitrust regulation. . . . This immunity, however, is narrowly circumscribed.  It does not extend to commercial transactions with a 'public service aspect.'  Courts classify a transaction as commercial or noncommercial based on the nature of the conduct in light of the totality of surrounding circumstances."  United States v. Brown University, 5 F.3d at 666 (quoting Goldfarb v. Virginia State Bar, 421 U.S. at 787-88).  See also Association for Intercollegiate Athletics for Women v. National Collegiate Athletic Association, 735 F.2d 577, 584-85 (D.C. Cir. 1984) ("Practices by non-profit organizations that economically disadvantage consumers are generally prohibited even though such practices may be designed to advance independent social or political values.").

_____

[36]    "Marjorie Webster is of questionable vitality after Goldfarb, to the extent that it draws a bright line between education and business, or accreditation policy and commerce."  Welch v. American Psychoanalytic Association, No. 85 Civ. 1651, 1986 U.S. Dist. LEXIS 27182, at *9 (S.D.N.Y. April 4, 1986).  See also Foundation for Interior Design Education Research v. Savannah College of Art & Design, 244 F.3d 521, 530 (6th Cir. 2001).

Plaintiffs allege that certain ACGME accreditation standards have a clear impact on commerce because they facilitate and enforce the suppression of competition in the hiring, employment and compensation of resident physicians effectuated by the Match Program and allow the ACGME to monitor resident compensation.  See Pls.' (b)(6) Opp. at 27-28.  While the ACGME responds that it lacks a motive to conspire to depress salaries and compensation in the medical resident field and offers non-anticompetitive explanations for the existence of the accreditation standards, this is not the proper stage of the proceedings in which to evaluate motive or weigh countervailing explanations for actions allegedly taken in furtherance of the conspiracy.  See Section IV(A)(3), *supra*; see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 66 (2d Cir. 1997) (in considering Rule 12(b)(6) motion, district court improperly relied on defendant's assertion that relevant activity concerned educational rather than commercial gain); Welch v. American Psychoanalytic Association, 1986 U.S. Dist. LEXIS 27182, at *19-20 ("[A]ntitrust actions involving motive and intent to conspire and injure . . . [are] particularly inappropriate for [dispositive motion] treatment.") (internal quotation omitted).  Rather, the question at this stage is whether the allegations in plaintiffs' complaint provide an adequate basis from which the Court can infer that the ACGME participated in the charged conspiracy.

In DM Research, Inc. v. College of American Pathologists, Judge Boudin addressed the circumstances in which accreditation standards have been found to be anticompetitive.  He noted that "[m]erely to say that the standards are disputable or have some market effects has not generally been enough to condemn them as 'unreasonable' under the Sherman Act."  DM Research, Inc. v. College of American Pathologists, 170 F.3d at 57.  Instead,

"something else or more extreme is generally present in the cases that have condemned quality standards as anticompetitive." <u>Id</u>.  In the instant case, plaintiffs have alleged "something else or more extreme."  In their complaint plaintiffs have alleged that the ACGME standards directly limit competition in the hiring of medical residents by, *inter alia*, requiring prospective residents to contractually commit to any offers they receive through the Match Program and by providing for the ACGME's policing of institutional defendants' compensation levels.  <u>See</u> Compl. ¶¶ 88(a)-(d).  Upon consideration of the foregoing, in concert with plaintiffs' broader allegations of conspiracy, the Court concludes that plaintiffs have set forth allegations in their complaint from which it reasonably may be inferred that the ACGME is a member of the alleged conspiracy.  If the facts prove otherwise after discovery, a motion for summary judgment will be appropriate.

C.  <i>Yeshiva University's Motion to Dismiss</i>

Defendant Yeshiva University moves to dismiss for failure to state a claim on the ground that the complaint does not set forth any allegations connecting it to the alleged conspiracy.  <u>See</u> Yesh. (b)(6) Mem. at 3.  The only allegation in the complaint that explicitly concerns Yeshiva is that "[d]efendant Yeshiva University ('Yeshiva'), of which the Albert Einstein College of Medicine ('AEC') is a part, . . . through AEC, sponsors medical residency programs, employing members of the Plaintiff class.  Yeshiva has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint."  Compl. ¶ 50.

Plaintiffs argue that this is enough to tie Yeshiva to the conspiracy because the term "defendants" as it is used throughout the complaint includes "employers of resident physicians, *entities related to and/or affiliated with such employers*, or professional organizations through which the illegal restraints set forth in this Complaint are accomplished." Pls.' (b)(6) Opp. at 50 (quoting Compl. ¶ 5) (emphasis added). Notwithstanding this general definition, the Court concludes that the complaint fails to allege adequately any claim against Yeshiva.

The only connection Yeshiva is alleged to have to the price-fixing conspiracy is that it "sponsors" the graduate medical education aspects of the AEC on behalf of the ACGME. See Compl. ¶ 50. In the complaint, however, a "Sponsoring Institution" is defined as an institution "operating medical residency programs in one or more specialties, as well as individual residency programs ('Sponsored Programs') affiliated with those and other institutions . . . ." Id. ¶ 16. Yeshiva does not fall into this category because it does not operate a medical residency program nor is it an individual residency program.[37] Any allegations concerning the activities of "Sponsoring Institutions" therefore do not pertain to Yeshiva. In addition, unlike the other institutional defendants, Yeshiva is not alleged to own or operate a hospital or health center, to employ medical residents or to participate in either the Match Program or the COTH Survey. Any allegations concerning these activities therefore also do not pertain to Yeshiva.

---

[37]    Similarly, plaintiffs define the defendant class in relevant part as "all ACGME-accredited Sponsoring Institutions as of the date of certification of the Defendant Class, and entities that were ACGME-accredited Sponsoring Institutions at any time since May 7, 1998." Id. ¶ 58. Yeshiva therefore does not fall into the proposed defendant class because it is not a "sponsoring institution" as that term is defined.

The only aspect of the alleged conspiracy that arguably may link Yeshiva to the conspiracy is that portion of the complaint that addresses the ACGME accreditation standards, because Yeshiva admits that it monitors residency program compliance with ACGME standards for the accreditation association. See Yesh. (b)(6) Mem. at 4. In that section of the complaint, however, plaintiffs set forth no allegations concerning entities like Yeshiva that monitor residency program compliance with ACGME standards on behalf of the ACGME. Even the allegation that expressly pertains to residency program compliance does not mention the existence or role of such a monitoring entity. Plaintiffs only allege that "in reviewing compliance with accreditation standards, the ACGME *directly* reviews compensation and other terms of employment with the purpose and effect of fixing, depressing, standardizing and stabilizing such compensation and terms." Compl. ¶ 88(d) (emphasis added).

Although plaintiffs assert that ACGME accreditation standards can regulate residency programs "only through conduits like Yeshiva," (Pls.' (b)(6) Opp. at 51), plaintiffs have not set forth any allegations in their complaint that describe or challenge the activities of such "conduits," or specifically of Yeshiva. The Court will not infer from the generalized allegations concerning the ACGME that a separate entity that monitors ACGME-accredited medical residencies on behalf of the ACGME participated in the conspiracy. See Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 527 (1983) ("It is not . . . proper to assume that [a plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged."). Plaintiffs cannot reinforce their complaint by creatively recasting and embellishing the allegations of their complaint in their opposition brief. See Car Carriers, Inc. v. Ford Motor

Corp., 745 F.2d at 1107; Coleman v. Pension Benefit Guaranty Corp., 94 F. Supp. 2d at 24 n.8.

Even construing the complaint in a light most favorable to plaintiffs, the Court concludes that the

complaint fails to state a claim for which relief can be granted against Yeshiva University.

## V.   CONCLUSION

For the foregoing reasons, the Court first concludes that it has personal

jurisdiction over the following institutional defendants: Barnes Jewish-Hospital, Baylor College

of Medicine, Beth Israel Deaconess Medical Center, Inc., Boston Medical Center Corp., Cedars-

Sinai Medical Center, The Cleveland Clinic Foundation, Emory University, Rhode Island

Hospital, Rush-Presbyterian-St. Luke's Medical Center, St. Louis University, Stanford Hospital

& Clinics, Thomas Jefferson University Hospital, Inc., Administrators of the Tulane Educational

Fund, University Hospitals of Cleveland, Inc. and Yale-New Haven Hospital, Inc.  The Court

therefore denies the motions to dismiss for lack of personal jurisdiction filed by those institutions

under Rule 12(b)(2) of the Federal Rules of Civil Procedure.  The Court concludes that it does

not have personal jurisdiction over institutional defendant Washington University Medical

Center and therefore grants its motion to dismiss.

The only two organizational defendants that have filed motions to dismiss for lack

of personal jurisdiction are the American Board of Medical Specialties and the Council of

Medical Specialty Societies.  The Court concludes that it does not have personal jurisdiction over

either organizational defendant and therefore grants those defendants' motions to dismiss for lack

of personal jurisdiction.

Second, the referral to arbitration of any portion of plaintiffs' single conspiracy claim would be improper. The Court therefore has subject matter jurisdiction over plaintiffs' entire claim and denies defendant National Resident Matching Program's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure and its motion to compel arbitration. It also denies the motion to compel arbitration filed by the American Medical Association.

Finally, the Court finds that plaintiffs adequately have alleged a common agreement to displace competition in the recruitment, hiring, employment and compensation of resident physicians and to impose a scheme of restraints that has the purpose and effect of fixing, artificially depressing, standardizing and stabilizing resident physician compensation and other terms of employment among certain defendants. Those defendants include movants the Association of American Medical Colleges and the Accreditation Council for Graduate Medical Education. Accordingly, the Court denies the motions to dismiss for failure to state a claim upon which relief can be granted filed by these two organizational defendants. Because plaintiffs have failed adequately to allege that movants the American Hospital Association, the American Medical Association or Yeshiva University participated in the conspiracy, the Court will grant the motions to dismiss for failure to state a claim filed by those defendants.

An Order consistent with this Opinion shall be issued this same day.

SO ORDERED.


_____
PAUL L. FRIEDMAN
DATE:                           United States District Judge

-92-